(No. 76889.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT SIMPSON, Appellant.

*Opinion filed March 21, 1996.—Rehearing denied June 3, 1996.*

118

HARRISON, J., took no part.

124

Charles M. Schiedel, Deputy Defender, of the Office of the State Appellate Defender, of Springfield, and Robert Simpson, *pro se*, for appellant.

James E. Ryan, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee Goldfarb and James S. Beligratis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County defendant, Robert Simpson, was convicted of armed robbery and first degree murder. At a separate sentencing hearing, the same jury found defendant eligible for the death penalty and further determined that there were no mitigating factors sufficient to preclude imposition of that sentence. The trial judge sentenced defendant to death on the murder conviction and to 30 years' imprisonment on the armed robbery conviction. Defendant's execution has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a). For the reasons stated below, we affirm defendant's convictions and sentences.

## BACKGROUND

The evidence at trial established that at approximately 10 a.m. on May 20, 1992, defendant, Carolyn LaGrone and Lurlarn Young drove to the Fairway Food store in Glenwood. Defendant and LaGrone entered the store, but left the store a few minutes later without making any purchases. At approximately 10:15 a.m., defendant and LaGrone reentered the store, while Young remained in the car. Defendant approached the service desk, carrying a gun concealed under a piece of newspaper.

LaGrone testified on behalf of the prosecution that when defendant approached the service desk he informed Kitty Koszut, a store employee, that he was robbing the store. Koszut responded, "You must be kidding." Defendant then grabbed Koszut by the back of her smock and forced her to the ground. LaGrone approached the service area and defendant placed money from a cash drawer into a purse that LaGrone held. As defendant was putting money into the purse, Barbara Lindich, a store customer, walked up behind LaGrone and peered over her shoulder. LaGrone testified that defendant asked Lindich if she wanted to help, and then defendant shot Lindich, who later died as a result of the gunshot. Defendant next checked the safe, and then he and LaGrone exited the store. When they reached the car where Young was waiting, defendant drove out of the parking lot.

While they drove away from the scene, Young counted the money and destroyed checks taken from the store. LaGrone testified that they then exited the expressway and entered an alley where defendant removed his shirt and wiped either dirt or makeup from his face. Defendant placed the shirt in a garbage can in the alley.

LaGrone was arrested on May 25, 1992. She gave a statement to police detailing her, Young's and defendant's participation in the offenses. Young was also arrested on May 25, 1992, in a car matching the description of the vehicle seen leaving the scene of the robbery. Young gave police two statements, both of which were reduced to writing. Young also executed a voluntary consent to search the apartment that she and defendant shared.

In the evening of May 25, 1992, police gained entry into the apartment defendant and Young shared by opening the door to the apartment with keys Young had

supplied. Defendant was found in the apartment and was placed under arrest. In the early morning hours of May 26, 1992, defendant was placed in a lineup for identification purposes. Eyewitnesses, including employees, who were in the store at the time of the robbery and murder identified defendant as the man they saw rob the Fairway Food store.

On May 26, 1992, police, accompanied by Young, returned to the apartment building where defendant and Young resided. With Young's consent, the police searched a storage locker assigned to Young and defendant. Included in the items police recovered from the locker were a .380-caliber semiautomatic pistol, a .25-caliber semiautomatic pistol, ammunition, a theatrical kit, a beige purse and a khaki raincoat.

At trial, three employees present in the Fairway Food store on the day of the offenses identified defendant as the man who was behind the service desk holding a gun. A customer in the store on the day of the offenses also identified defendant at trial as the man she saw passing in the lane next to her, after she heard a male say, "This is a stick-up," and heard a loud "pop." At trial, two of the same three employees and the customer identified one of the guns recovered from defendant's storage locker as the weapon they saw defendant holding at the time of the offenses.

Shortly after police arrived at the scene, police summoned Hayden Baldwin, a crime scene technician, to process the area. Baldwin testified that he recovered fingerprint impressions from various objects and found a spent casing inside the service office. Later that same evening, in response to a call from police, Baldwin returned to the crime scene to recover a spent projectile that employees had discovered in a door frame.

Barbara Lindich, the store customer shot at the time of the robbery, died as a result of a single gunshot wound

to the neck. Forensic testing revealed that the cartridge case recovered from the scene was fired from one of the pistols recovered from defendant's storage locker. Expert testimony also showed that the projectile recovered from the door frame at the crime scene matched the test projectile fired from the same pistol.

Jacqueline Farcaro, a forensic scientist at the Illinois State Police crime lab, testified that latent fingerprints recovered from the crime scene were identified as those of LaGrone.

During all phases of the pretrial and trial proceedings, defendant represented himself with the public defender acting as standby counsel. Defendant called several witnesses who were present in the store at the time of the robbery and murder to testify on his behalf. Although the defense witnesses' description of the events did not corroborate the testimony of the State's witnesses in all respects, none of the defense witnesses' testimony contradicted the prosecution witnesses' accounts. Defendant called codefendant Young to testify, but Young invoked her fifth amendment rights and did not testify. At defendant's request, but against the advice of the judge, the custodial statements of LaGrone and Young were published to the jury. Defendant declined to testify on his own behalf.

At the close of evidence, the jury returned a verdict finding defendant guilty of the first degree murder of Lindich and armed robbery. 720 ILCS 5/9—1(a), 18—2(a) (West 1992). The following day, the matter proceeded to a capital sentencing hearing before the same jury.

At the first stage of the sentencing hearing, the jury found that defendant was 18 or older at the time of the murder for which he was convicted and that he was eligible for the death penalty on the basis of the murder-in-course-of-felony aggravating factor. 720 ILCS 5/9—1(b)(6) (West 1992).

At the second stage of the sentencing hearing, various Chicago police officers and an assistant State's Attorney testified in aggravation. The witnesses described events including defendant's arrests for attempted murder of a police officer, battery, possession of a stolen motor vehicle, escape, fleeing at high speed from police in an automobile, and unlawful use of a weapon by a felon. Certified copies of defendant's prior convictions were entered into evidence. The evidence established that defendant had previously been convicted of and was sentenced to prison or probation for unlawful use of weapons, two separate charges of theft, possession of a stolen motor vehicle, attempted murder, aggravated battery, unlawful use of a weapon by a felon, two separate burglaries, damage to city property, contempt of court, and a charge of grand theft reduced to criminal trespass to a vehicle.

Defendant declined to present evidence in mitigation, but did make a closing argument. At the conclusion of the sentencing hearing, the jury found that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. The trial judge did not immediately enter judgment or sentence defendant, but with defendant's agreement appointed the standby counsel to represent defendant at post-trial proceedings. However, the judge stated he would allow defendant to supplement appointed counsel's post-trial motions. The trial judge then continued the case for a hearing on post-trial motions.

After a hearing, the trial judge denied appointed counsel's post-trial motion on behalf of defendant and defendant's *pro se* post-trial motions. The judge then sentenced defendant to death for the murder conviction and 30 years' imprisonment for the armed robbery conviction. Defendant seeks review of his convictions and sentence in this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a).

## ISSUES

### Waiver of Right to Counsel

Defendant's first allegation of error on appeal is that his waiver of his sixth amendment right to counsel (U.S. Const., amend. VI) was not knowingly and intelligently made. Defendant asks this court to remand his case for a new trial or a new sentencing hearing.

Prior to trial defendant was represented by the public defender. In one of his earliest court appearances, against the advice of counsel, defendant demanded trial. Defendant informed the court that if his counsel was not prepared to proceed directly to trial, he would consider representing himself. However, after conferring with his appointed counsel, defendant rescinded his demand for an immediate trial.

At defendant's next court appearance he informed the court that he would be representing himself and that he did not want the public defender to be shown as representing him. The trial judge informed defendant that a formal waiver of counsel would be required, but that if defendant did proceed *pro se*, he would appoint the public defender as standby counsel. Defendant reiterated his demand for immediate trial, but agreed to confer with appointed counsel regarding his decisions.

Six weeks later, the public defender assigned to represent defendant asked the court to clarify whether defendant had waived counsel. The judge responded that the public defender was still appointed, but that defendant also had the right to represent himself or to hire another attorney. When the trial judge asked defendant if he understood that he had these choices, defendant responded equivocally that he was ready for trial. When the trial judge then asked him if he wanted to represent himself, he responded "if that's what's going to happen." The judge advised defendant against self-representation, and inquired whether defendant wished

to represent himself and if he wished to speak to counsel. Each time defendant responded that he was ready for trial. The judge told defendant that if he wished to represent himself, a formal waiver of counsel would be necessary.

When the judge informed defendant that he would have to make a formal waiver of counsel, defendant complained that multiple members of the public defender's office had appeared on his behalf.

At the court's suggestion defendant consulted with counsel regarding his concerns, but after a recess defendant persisted in his demand that he go to trial immediately. Both the trial judge and the assistant public defender explained that counsel could not provide effective assistance if forced to go to trial at this early stage of the proceedings. The judge informed defendant that he could hire a lawyer who would be willing to go to trial immediately or defendant could represent himself. The judge then asked defendant directly several times if defendant wished to represent himself, and each time defendant answered that he wanted to go to trial immediately.

The judge then informed defendant that he understood defendant to mean he wished to proceed without a lawyer. The judge formally admonished defendant of the charges against him and the range of possible penalties. Defendant stated that he understood the charges and the possible penalties. At the end of the judge's admonishments, defendant again complained that more than one member of the public defender's office had appeared on his behalf. Both the judge and counsel explained the need for more than one attorney to work on the case and the need for a substitute when the attorney assigned to defendant's case had a scheduling conflict. The judge told defendant that his appointed counsel was experienced, but needed time to effectively prepare for trial.

The judge then warned defendant that insistence on an immediate trial would likely result in the State's wanting a very quick trial. Defendant responded, "Let's go." The judge again told defendant that a formal waiver of counsel was required. The judge also restated that appointed counsel needed time to effectively prepare a defense and that the judge would not require them to go to trial without preparation. In response, defendant asked the judge whether "co-counsel" would be appointed to assist him if he represented himself. The judge explained that if defendant waived trial counsel, standby counsel would be appointed, but that standby counsel would be "merely an observer." The judge articulated the very limited role standby counsel would take and emphasized that defendant could confer with standby counsel, but that defendant would be representing himself. Defendant responded, "Sounds fine."

The judge again advised defendant of his right to have appointed counsel represent him, but told him that if the public defender were to continue to represent him, that would require that defendant allow the public defender to effectively prepare the case for trial. The judge once more told defendant that the assistant public defender was willing to represent defendant. Defendant responded, "He is not ready for trial." The judge acknowledged that the public defender was not ready to proceed, but explained that counsel had advised the court that in his judgment he needed time to prepare defendant's case. The judge then asked defendant directly if he wanted to represent himself, and defendant did not equivocate, but said "yes."

The judge described what an appointed attorney would do before and during trial on defendant's behalf. The judge also told defendant that he had the right to choose and hire his own lawyer or, if he was indigent, to have the court appoint a lawyer for him.

At the completion of his admonishments, the judge asked defendant if he understood, and defendant said "yes." The judge inquired if defendant still wished to give up his right to counsel and again defendant responded "yes." The court appointed the assistant public defender present in the courtroom as standby counsel and advised defendant he could consult with standby counsel regarding strategy or other questions.

When the court then asked defendant if the decision to waive counsel was "of [his] own free will," defendant stated "well, not of my own free will, but nobody force [*sic*] me." In response to the judge's query what defendant meant, defendant mentioned he had a problem with one of the assistant public defenders. The judge advised defendant that the attorney defendant had the problem with could be removed from the case, and he asked if defendant had a problem with that one lawyer, or if he just wanted to represent himself. Defendant stated that he thought it best to represent himself. The court accepted defendant's waiver and found that it was made freely and voluntarily. The judge also gave the public defender leave to withdraw as defendant's counsel, and appointed the assistant public defender present in court as standby counsel.

Following the court's finding that defendant's waiver was valid, the judge twice again during a two-week period queried defendant as to whether he wished to represent himself. Both times defendant told the court that it was his decision to represent himself.

Defendant raises several arguments to support his contention he did not make a knowing and understanding waiver of counsel. In *Faretta v. California*, the Supreme Court held that the sixth amendment right to counsel (U.S. Const., amend. VI) implicitly provides for the right of self-representation in criminal proceedings. *Faretta v. California*, 422 U.S. 806, 821, 45 L. Ed. 2d

562, 574, 95 S. Ct. 2525, 2534 (1975). However, the trial court must satisfy itself that the defendant's waiver of counsel is voluntarily, knowingly, and understandingly made. See *People v. Hessenauer*, 45 Ill. 2d 63, 68 (1970); *People v. Baker*, 92 Ill. 2d 85, 91 (1982); *People v. Baker*, 94 Ill. 2d 129, 136 (1983). Specifically, the trial court must determine that defendant has the ability to understand the proceedings, that he knows the significance and consequences of his decision, and that his waiver was not coerced. See *Godinez v. Moran*, 509 U.S. 389, 401 n.12, 125 L. Ed. 2d 321, 333 n.12, 113 S. Ct. 2680, 2687 n.12 (1993). The entire record should be considered in determining whether the waiver was knowingly and understandingly made. *People v. Barker*, 62 Ill. 2d 57, 59 (1975).

Defendant first argues that his waiver of counsel was not valid because the trial court failed to adequately assess his ability to understand his waiver of counsel. Defendant claims that the trial court was obligated to formally probe defendant's level of education, his prior legal experience, and his mental and emotional capacity to represent himself.

After admonishing defendant, the trial judge asked defendant what level of education he had attained, but defendant failed to answer the question and only responded that he thought he was competent. However, direct questioning regarding defendant's schooling is only one of many possible means to assess a defendant's ability to understand the nature of the right he was waiving. A defendant's background, experience and conduct are all factors to consider when determining if a valid waiver of counsel has been made. *Johnson v. Zerbst*, 304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, 1023 (1938). Viewing the record in its entirety, it is evident that the trial judge had ample opportunity in the pretrial proceedings to observe defendant and assess

his ability to understand the proceedings. The record indicates the defendant was literate, responsive and understanding. Defendant, age 39, had an extensive criminal history. He had demonstrated a familiarity with the judicial process and, according to the trial judge, had waived counsel and represented himself on a prior occasion. Further, defendant filed numerous motions and actively presented his defense. He demonstrated, in the words of the trial judge, that "[defendant] knew what he was doing" when he waived his right to counsel and chose to represent himself.

Defendant next argues that his waiver was not knowing because the trial court did not adequately probe defendant's reasons for proceeding *pro se*. First, defendant contends that the court should have explained that it was common for multiple members of the public defender's office to appear on a defendant's behalf.

Determining whether a defendant has made a knowing waiver is a factual determination based on the circumstances of each case. *Johnson,* 304 U.S. at 464, 82 L. Ed. at 1466, 58 S. Ct. at 1023. Here, the record indicates that the trial judge explored this concern with defendant. The court also allowed the assistant public defender to explain, on the record, the need to have more than one attorney assigned to the case.

Next, defendant claims that the court should have explained that there was no benefit in going to immediate trial. However, defendant's statement that no benefit was to be gained by demanding an immediate trial is not accurate. It is apparent from the record that defendant was familiar with the provisions of the speedy-trial statute (725 ILCS 5/103—5 (West 1992)), which requires that a defendant be tried within 120 days from the date he is taken into custody, unless delay is occasioned by the defendant (725 ILCS 5/103—5(a) (West 1992)). Under our speedy-trial provisions, if defendant does not occa-

sion a delay and is not tried within the 120 days, he shall be discharged from custody. 725 ILCS 5/103—5(d) (West 1992). We agree with the State that it is reasonable to conclude that defendant knew that the case against him could be dismissed if not brought to trial within the statutory period. Therefore, defendant was motivated to forgo continuances to avoid extending the period within which the State was obligated to bring him to trial under our speedy-trial provisions (725 ILCS 5/103—5 (West 1992)).

We also reject defendant's claim that his waiver of counsel was not valid because he was forced to choose between unprepared counsel and appearing *pro se*. Defendant relies on *Sanchez v. Mondragon*, 858 F.2d 1462 (10th Cir. 1988), for the proposition that waiver of counsel is not voluntary where defendant is unaware that he has a right to competent counsel. In *Sanchez*, the defendant chose to represent himself when the trial judge denied his request for substitution of counsel. The defendant asked for new counsel because his appointed counsel, despite defendant's continual protests that he was innocent, urged defendant to discuss potential plea bargains. His attorney's conduct led the defendant to believe that his counsel either did not have, or did not want to take, time to prepare a defense. On appeal, the court held that the defendant's waiver was not valid where defendant's reasons for dissatisfaction with counsel were not stated on the record and the trial judge had not made a formal inquiry into defendant's reasons for his dissatisfaction. *Sanchez*, 858 F.2d 1462.

*Sanchez* is inapposite. In the instant case defendant was not forced to choose between unprepared counsel and self-representation. Instead, defendant was faced with the choice between agreeing to a continuance to allow appointed counsel time to prepare or retaining other counsel or proceeding *pro se*.

Defendant argues that his actions after his waiver was accepted are evidence that he did not understand the consequences of his decision to waive counsel. Specifically, defendant contends that his comments regarding his dissatisfaction with appointed standby counsel should have alerted the court that defendant did not grasp the limitations on the role of standby counsel and should have caused the court to appoint counsel.

Following acceptance of defendant's waiver of counsel, the trial judge appointed a member of the public defender's office as standby counsel. Subsequently, the court ordered investigators from the public defender's office and the assistant public defender serving as defendant's standby counsel to proceed at defendant's direction and perform certain investigatory tasks that defendant could not perform while imprisoned.

Before trial, but many months into defendant's self-representation, defendant filed a motion for appointment of standby counsel other than the public defender. The basis of defendant's dissatisfaction was standby counsel's performance in an investigatory capacity. Defendant was dissatisfied that neither the investigator nor standby counsel had been able to meet his demand to procure certain evidence. However, the record indicates that the evidence defendant asked standby counsel to obtain either had been destroyed in compliance with routine procedures, was privileged or may not have existed.

Accordingly, defendant's motion was a manifestation of his frustration regarding his inability to procure evidence. Neither the motion nor the record demonstrates that defendant was under a mistaken belief that standby counsel would actively participate in preparing or presenting his legal defense. The trial judge described the role of standby counsel, and had repeatedly admon-

ished defendant that he could not proceed *pro se* and also be represented by appointed counsel. Defendant understood that standby counsel had been directed by the court to carry out an investigatory function in addition to his normal duties as standby counsel, and defendant's complaints were directed at the investigatory function. It should also be noted that when defendant asked for new standby counsel he did not express a desire to terminate his self-representation. Defendant's request for new standby counsel resulted from his disappointment with the results of an investigation and had nothing to do with defendant's legal defense.

Defendant also claims he did not make a knowing waiver of his right to counsel at sentencing because the trial court did not readmonish defendant of his right to counsel before the sentencing hearing. Defendant maintains that his actions during the guilt phase of trial, specifically his misperception of standby counsel's role and his publishing to the jury his codefendants' out-of-court incriminating statements, demonstrated his lack of capacity to represent himself. Defendant alleges that these actions presented circumstances that should have warranted the trial court's readmonishing him prior to the sentencing phase.

As a preliminary note, we do not agree that defendant's publication of his codefendant's statements to the jury was unreasonable. As the State notes, defendant may have published codefendant Young's statements to expose inconsistencies between her initial exculpatory statement and a later inculpatory statement wherein Young admitted that she lied about her involvement in the crimes. Additionally, LaGrone's statement was essentially consistent with her testimony at trial.

Regardless of the wisdom of publishing the statements to the jury, defendant's tactic does not demonstrate a lack of capacity to waive counsel. The level of a

defendant's competency as a lawyer is not a measure of his competency to waive counsel. *Godinez v. Moran*, 509 U.S. 389, 400, 125 L. Ed. 2d 321, 333, 113 S. Ct. 2680, 2687 (1993) ("a criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation" (emphasis in original)).

This court has also repeatedly upheld the "continuing waiver" rule (*People v. Johnson*, 119 Ill. 2d 119, 147 (1987); *People v. Baker*, 92 Ill. 2d 85, 95 (1982)), which provides that absent significantly changed circumstances or a later request for counsel, an intelligently and knowingly made waiver of counsel applies to all phases of trial. *Baker*, 92 Ill. 2d at 95. Circumstances requiring readmonishment before sentencing include lengthy delays between trial phases, newly discovered evidence which might require or justify advice of counsel, new charges brought, or a request from defendant. *People v. Baker*, 92 Ill. 2d 85, 93-94 (1982), citing *Davis v. United States*, 226 F.2d 834, 840 (8th Cir. 1955). However, a defendant's technical decisions and legal knowledge and ability are not relevant to an assessment of whether defendant knowingly exercised his right to waive counsel and defend himself. See *Faretta*, 422 U.S. at 836, 45 L. Ed. 2d at 582, 95 S. Ct. at 2541. Therefore, defendant's claim that his own representation was inadequate is not sufficient to indicate that his knowing and understanding waiver was not operative at sentencing or that he should have been readmonished at the end of the trial and before the penalty phase. Moreover, there was no lengthy period between the guilt phase and the sentencing hearing, which commenced immediately after the guilt phase. Defendant never indicated he wished to terminate his self-representation, nor did he ask that counsel be appointed. We find no change of circumstances here which would invalidate operation of defendant's pretrial waiver; therefore, the trial court

did not commit error when it did not readmonish defendant before sentencing.

## Suppression of Identification Evidence

Defendant maintains that the trial court erred when it did not suppress pretrial identification evidence that defendant alleges was the result of an unnecessarily suggestive lineup and the fruit of an illegal warrantless arrest.

Defendant first claims that the lineup was suggestive because witnesses at the crime scene described the robber as having curly hair. Defendant maintains that he was the only lineup participant with curly hair.

Defendant filed a *pro se* motion to suppress identification evidence. Testimony at the hearing on the motion indicated that five witnesses to the Fairway Food store robbery viewed a lineup on May 26, 1992. Sergeant Al DiMare of the Glenwood police department testified that defendant and four other black males participated in the lineup. At the time of the lineup, defendant was 39 years old, 5 feet, 11 inches tall, and stated that he weighed 179 pounds. The other participants in the lineup ranged in height from 5 feet, 9 inches tall to 6 feet, 1 inch tall and weighed from 144 to 210 pounds. An examination of the lineup photograph, introduced at the hearing to suppress and included in the instant record, shows that all of the lineup participants had similar skin tone, had moustaches, fairly short hair and wore casual clothing. The photograph also indicates that several of the lineup participants had curly hair, although defendant's curls appear larger than those of the other men in the lineup.

The trial judge denied the motion to suppress, finding defendant had not proven the lineup was suggestive. The judge found that considering the totality of the circumstances, the lineup appeared fair and that any argument about defendant's description would go to the weight of the lineup identification at trial.

The determination whether a pretrial confrontation in a specific instance is " 'so unnecessarily suggestive and conducive to irreparable mistaken identification that [defendant] was denied due process *** depends on the totality of the circumstances surrounding it.' " *People v. Richardson*, 123 Ill. 2d 322, 348 (1988), quoting *Stovall v. Denno*, 388 U.S. 293, 302, 18 L. Ed. 2d 1199, 1206, 87 S. Ct. 1967, 1972 (1967). Defendant bears the burden of establishing that the pretrial confrontation was impermissibly suggestive. *People v. Enis*, 163 Ill. 2d 367, 398 (1994).

We conclude that defendant has not shown that the lineup identification was impermissibly suggestive. The record and the lineup photograph do not support defendant's characterization that the lineup participants were "grossly dissimilar." Defendant's hair style was not so distinctive as to render the lineup suggestive. Participants in a lineup need not be physically identical (*Richardson*, 123 Ill. 2d at 350), and as noted earlier, here the participants' general physical features were similar. Considering the totality of the circumstances of the lineup, we concur in the trial court's finding that the differences in defendant's and the other participants' appearances did not render the lineup unduly suggestive.

Defendant also claims that the in-court identification testimony should have been suppressed because Kitty Koszut, a store employee, testified at trial that after she identified the defendant in the lineup, a police officer or an assistant State's Attorney told her that she had selected the correct individual. Defendant contends this confirmation tainted any subsequent identification testimony.

The State argues, and we agree, that even if Koszut's identification of defendant was confirmed by an officer or an assistant State's Attorney after the lineup,

sufficient circumstances existed to conclude that Koszut's identification testimony was independently reliable and admissible against defendant. Even where identification is found to be impermissibly suggestive, such testimony will be admissible where the State proves that based on the totality of the circumstances, the witness is identifying the defendant based on an independent recollection of the incident. *Enis*, 163 Ill. 2d at 398. In determining whether the witness' identification is reliable, the court must look to such factors as "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199-200, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382 (1972); *People v. Williams*, 118 Ill. 2d 407, 413 (1987).

Here, Koszut was present at the time of the offenses and had ample opportunity to view defendant when he approached her in a well-lit area and told her he was robbing the store. She had a high degree of attention to defendant because he was standing in front of her at the service desk at the time of the confrontation. Immediately following the crime, she accurately described defendant as a black male, with broad shoulders, approximately 30 to 40 years of age, wearing a tan jacket. Defendant was 39 years old, 5 feet, 11 inches tall and the photo of defendant in the lineup depicts broad shoulders. Other witnesses also testified that defendant wore a tan jacket and police recovered a khaki jacket from defendant's residence. Koszut viewed the lineup less than six days after the crimes occurred, and she exhibited a high degree of certainty when she quickly and unhesitantly identified defendant in the lineup. Al-

though her in-court identification took place 21 months after the offenses and the lineup, she also identified defendant with certainty in court. Given the totality of the circumstances, we believe Koszut had adequate independent recollection to make her in-court identification testimony reliable. Accordingly, the trial court correctly denied defendant's motion to suppress identification testimony.

Defendant next claims that his motion to suppress should have been allowed because the identification testimony was the fruit of an illegal, warrantless arrest. The State does not deny that defendant was arrested without a warrant, but argues that defendant's arrest in his home was valid owing to both codefendant Young's execution of a consent-to-search form and the presence of exigent circumstances.

Defendant filed a *pro se* motion to quash his arrest and suppress evidence obtained as the result of the arrest. At the hearing on defendant's motion, evidence established that on May 25, 1992, police learned that fingerprints recovered from the crime scene matched the prints of codefendant LaGrone. Later the same day, after she was taken into custody, LaGrone gave police a statement implicating Young, defendant and herself in the May 20, 1992, robbery and murder at the Fairway Food store. Lurlarn Young was also taken into custody on May 25, 1992, and she provided police with statements implicating defendant in the robbery and murder. Young also told police that she and defendant lived together in an apartment in Riverdale, Illinois.

Police testified that defendant's physical description, obtained from his criminal history, was consistent with the physical description of the robber given by crime scene witnesses. Police also learned that defendant had an extensive criminal history and had previously been convicted and incarcerated for the attempted murder of

a police officer. Defendant's criminal history was marked: "Approach with Caution. Extremely Dangerous."

Officers were located at the apartment building throughout the day of May 25, 1992. In the afternoon, with LaGrone's assistance, police tried unsuccessfully to draw defendant out of the apartment. Several subsequent calls to the apartment went unanswered. When the police decided to enter the apartment to search for evidence, they believed defendant was possibly in the apartment, that he had a history of violent behavior, and that the murder weapon had not been recovered. Accordingly, police requested assistance from the South Suburban Emergency Response Team (SSERT) to minimize the risk to officers entering the premises.

Late that evening, officers unlocked the apartment door with Young's keys. As they entered, police observed a man running across the apartment. SSERT members deployed a diversionary device to disorient the occupant and then officers entered the apartment and took defendant into custody. Shortly after he was taken to the police station, defendant was placed in a lineup and identified by five witnesses.

The trial court, finding that valid consent had been given and that exigent circumstances existed, upheld the warrantless arrest of defendant and denied his pretrial motion to quash the arrest and suppress identification testimony.

It has long been established that the fourth amendment (U.S. Const., amend. IV) generally bars warrantless and nonconsensual arrests in a person's home absent exigent circumstances. *Payton v. New York*, 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980). However, when voluntary consent is given to enter a residence and an arrest is effected based on probable cause, the suspect's rights under the fourth amendment

are not violated. *People v. Bean*, 84 Ill. 2d 64, 69 (1981). Consent to enter may be obtained from the defendant or a third party who possesses common authority over the premises. *United States v. Matlock*, 415 U.S. 164, 171, 39 L. Ed. 2d 242, 250, 94 S. Ct. 988, 993 (1974). Common authority exists where there is "mutual use of the property by persons generally having joint access or control for most purposes." *Matlock*, 415 U.S. at 171 n.7, 39 L. Ed. 2d at 250 n.7, 94 S. Ct. at 993 n.7. Warrantless entry is also valid where police are given consent to enter by one the police reasonably believe has authority to consent. *Illinois v. Rodriguez*, 497 U.S. 177, 186, 111 L. Ed. 2d 148, 160, 110 S. Ct. 2793, 2800 (1990).

Testimony at the hearing on the motion and at trial revealed that the apartment lease was signed by both Young and defendant. The landlord of the property testified that he thought he rented the apartment to Young and that he believed Young usually paid the rent. At the time of her arrest, Young possessed keys to the apartment and told police that the apartment was her residence. As a leaseholder and current resident, Young had mutual use of the property and therefore had common authority to consent to a search of the property.

We also find meritless defendant's claim that Young's consent was only given to search for evidence and not to arrest defendant. Young's signed consent form, a part of the instant record, gave police consent to "conduct a complete search" of the premises. Consent to enter a residence by the person to be arrested or some other person with sufficient interest validates a warrantless arrest. See 2 W. LaFave, Search & Seizure § 6.1(c), at 582 (2d ed. 1987) (fourth amendment merely requires consent to enter a home, not consent to enter in order to carry out a specified purpose); *People v. Henderson*, 142 Ill. 2d 258, 298-99 (1990).

Defendant's reliance on *Steagald v. United States*,

451 U.S. 204, 68 L. Ed. 2d 38, 101 S. Ct. 1642 (1981), for the proposition that his right to be protected against seizure in his home is separate from Young's right to consent to have her home searched is not persuasive. At issue in *Steagald* was the validity of the defendant's warrantless arrest in his home where there was no consensual entry or exigent circumstances but where police possessed a warrant for the arrest of another party believed to be in the defendant's home. *Steagald,* 451 U.S. 204, 68 L. Ed. 2d 38, 101 S. Ct. 1642. *Steagald* is factually distinguishable from the instant case. Here, entry was consensual because a person with mutual control over the premises gave permission to search. See *Matlock,* 415 U.S. at 172, 39 L. Ed. 2d at 250, 94 S. Ct. at 993.

Defendant does not challenge the existence of probable cause for the arrest. Accordingly, because probable cause to arrest defendant has not been challenged and Young's consent to search was valid, we find the trial court properly denied the motion to quash defendant's arrest and suppress identification evidence obtained as a result of the arrest.

The State also argues that exigent circumstances existed to justify defendant's warrantless arrest. Because we find that the arrest was valid on the basis that entry was consensual, we need not address this additional contention.

## Evidence Seized From Storage Locker

Defendant next claims that the trial court erred in denying his motion to suppress evidence seized from closed bags within a shared storage locker. Defendant argues that police had no reasonable belief that codefendant Young's authority to consent to search the storage locker extended to search and seizure of evidence within closed bags in the locker.

Testimony at the hearing on defendant's *pro se* mo-

tion to quash arrest and suppress evidence established that on May 26, 1992, Young informed police that defendant had placed items used in the robbery and murder in bags and stored them in a storage bin in the basement of the apartment building where she lived with defendant. Young voluntarily executed a consent-to-search form, giving police permission to search the storage locker she shared with defendant. Young accompanied police to the apartment building and unlocked the locker with her keys. Among the items police recovered from the locker were two guns, ammunition, a makeup kit, a beige purse, and a khaki raincoat.

The trial judge denied the motion to suppress evidence seized from the locker, finding that Young had authority to consent to the search of the bags within the storage locker.

The State argues that defendant has waived this issue for failure to raise it in any of his or his appointed counsel's post-trial motions. It is well settled that the failure of the defendant to raise an issue in a written motion for a new trial constitutes a waiver of that issue. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Although Rule 615(a) (134 Ill. 2d R. 615(a)) allows review of issues that are plain error, we do not believe that the plain error doctrine will defeat the waiver here. Plain error may be invoked in criminal cases where the evidence was closely balanced or the error was of such magnitude that the accused was denied a fair trial. *People v. Bean*, 137 Ill. 2d 65, 80 (1990). We do not believe that either element has been satisfied here. The evidence of defendant's guilt was overwhelming, including in-court identification by five witnesses, physical evidence, inculpatory trial testimony of one codefendant and inculpatory statements by both codefendants.

Nor do we believe the alleged error can be described as substantial. Considerable evidence was available to

convict defendant without relying on recovery of weapons and other physical evidence found in the storage locker. Accordingly, we consider the matter waived.

### Victim Impact Testimony

Defendant next claims that the trial court erred in allowing the State to present prejudicial, irrelevant victim impact evidence to the jury. Defendant alleges that admission of the prejudicial testimony warrants a new trial.

The State's first witness at trial was Albin Lindich, the surviving spouse of the murder victim. Lindich testified that he and the victim had been married for 24 years and that the victim was survived by 11 children, including step-children, and seven grandchildren. Lindich also testified that he took one of his children out of school to notify him of his mother's death.

Although defendant raised this issue in his post-trial motion, he did not offer a contemporaneous objection at trial. As stated, both a trial objection and a written post-trial motion raising an issue are required for alleged errors that could have been raised at trial. *Enoch*, 122 Ill. 2d at 186; *People v. Mahaffey*, 166 Ill. 2d 1, 27 (1995). Therefore, defendant has waived this issue. Defendant does not raise the issue of plain error, and, as noted previously, the evidence at trial was overwhelming and not closely balanced.

### Prosecutor's Comments at Sentencing

Defendant contends that the prosecutor's remarks during closing arguments at sentencing improperly diminished the jury's sense of responsibility in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633 (1985).

In *Caldwell*, the Court found constitutional error in a prosecutor's arguments that the decision of the sentencing jury was not final because it was subject to

judicial review. The Court held that resting a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere violates a defendant's eighth amendment rights. *Caldwell*, 472 U.S. at 329, 86 L. Ed. 2d at 239, 105 S. Ct. at 2639.

In the present case, in his rebuttal argument at sentencing, the prosecutor paraphrased defendant's closing argument and reminded the jury that defendant had said "go ahead and kill me." The prosecutor told the jury that if defendant really felt that way, he would have used one of his own guns on himself. The prosecutor then said:

> "But you don't want to die, Mr. Simpson. That is a ploy you are using against [the jurors], to make them feel guilty, to make them feel guilty if they sentence you to death, and it's not them who [are] sentencing you to death, Mr. Simpson, it's the State of Illinois.
>
> The law sentences you to death. The law that you couldn't follow *** [t]hat's who did it, not these people, but you go ahead and make them feel guilty like you want to do."

The prosecutor noted that the decision to impose the death penalty was a difficult one and urged the jury not to allow vengeance to motivate its decision to impose the death penalty, because that would be unfair to defendant.

Later in his rebuttal argument, the prosecutor asked the jury to follow the law "because the law is what convicts people, not anything else. It's not you giving him the death sentence, it's him. It was his road he chose." The prosecutor concluded by reminding the jury of its obligation to follow the law and impose the death sentence based on the evidence offered during the death penalty hearing. Defendant did not object to any of the prosecutor's comments.

Because defendant failed to object to the remarks in

the sentencing hearing, this issue is waived. *People v. Coleman*, 129 Ill. 2d 321, 347 (1989). We further believe that the challenged prosecutorial comments do not rise to the level of plain error. See 134 Ill. 2d R. 615(a). The evidence at the second stage of defendant's sentencing hearing was not closely balanced where the State introduced overwhelming aggravating evidence against defendant and defendant declined to present any evidence in mitigation.

Further, we do not believe that the alleged error was so substantial that it deprived defendant of a fair sentencing hearing. Viewing the challenged comments in the context of the entire sentencing proceeding, we do not believe that the remarks misled the jury or diminished its sense of responsibility in determining the appropriateness of the death penalty. *People v. Flores*, 153 Ill. 2d 264, 287 (1992). The prosecutor's closing argument at sentencing emphasized the testimony of the witnesses and reviewed the aggravating factors and the lack of mitigating evidence. The prosecutor also asked the jury to sign the verdict form that indicated there were insufficient mitigating factors to preclude the imposition of the death penalty. Further, the challenged remarks were invited by defendant's own comments in his closing argument, and therefore were not error. *People v. Hobley*, 159 Ill. 2d 272, 321 (1994). We also note that after the challenged remarks the prosecutor told the jury "it's going to be your decision to make." After closing arguments, the trial judge carefully instructed the jury regarding its responsibilities. Moreover, the verdict forms properly stated that it was the jury that must decide the question of whether the death sentence should be imposed. Considering all of the arguments and instructions at the sentencing hearing, we do not believe that the jury's focus was diverted from its proper responsibility in sentencing.

### Natural Life Imprisonment Instruction

Defendant contends the trial court erred when it did not inform the jury that if not sentenced to death, defendant could be sentenced to life imprisonment without the possibility of parole. Defendant argues that because the prosecutor raised the issue of defendant's prior criminal record and his commission of crimes after he was paroled, the court was obligated to instruct the jury on the alternative sentences defendant could receive, specifically natural life imprisonment.

During the prosecution's closing argument in the second phase of sentencing, the prosecutor reminded the jury that defendant had been imprisoned and paroled on numerous occasions, only to commit a subsequent crime. Defendant did not object to these comments and did not tender a specific instruction on alternate sentences. The trial judge instructed the jury that if it should determine that a death sentence was inappropriate, the court would impose a sentence other than the death penalty. See Illinois Pattern Jury Instructions, Criminal, No. 7C.05 (3d ed. 1992).

A defendant may not generally challenge an instruction on appeal unless he makes a contemporaneous objection and, if appropriate, tenders an alternative instruction at trial. *People v. Rissley*, 165 Ill. 2d 364, 406 (1995). Accordingly, defendant has waived this issue. Moreover, defendant also failed to raise the issue of the jury instruction with any specificity in his post-trial motion, also warranting waiver. *People v. Easley*, 148 Ill. 2d 281, 337 (1992).

Although we do not address defendant's jury instruction claim on the merits, we note that this court has previously rejected defendant's argument. A defendant is not entitled to have the jury informed that if defendant is not sentenced to death, he is eligible for a range of possible alternate sentences, including natural life imprisonment. *People v. Simms*, 143 Ill. 2d 154, 182

(1991). While a natural life jury instruction is required in multiple-murder cases where natural life is the only available alternative to the death sentence (*People v. Gacho*, 122 Ill. 2d 221 (1988)), this court previously declined to extend that rule to cases where, like the present case, the defendant is statutorily eligible for a sentence less than natural life in prison. *People v. Williams*, 161 Ill. 2d 1, 71 (1994); see also *People v. Bean*, 137 Ill. 2d 65, 118 (1990).

Defendant relies on *Simmons v. South Carolina*, 512 U.S. ____, 129 L. Ed. 2d 133, 114 S. Ct. 2187 (1994), in support of his argument that the court was required, *sua sponte*, to instruct the jury on the alternate sentences defendant could serve if he did not receive the death penalty. In *Simmons*, the defendant was convicted of murder and under applicable state law, his convictions for prior violent crimes rendered defendant ineligible for parole. The trial judge refused defense counsel's request to define for the jury the term "life imprisonment" so that the jury would understand that in defendant's case, the sentence did not include the possibility of parole. The trial judge also refused to answer the jury's query during deliberations as to whether the imposition of a life sentence carried with it the possibility of parole.

On appeal, the Supreme Court found that the trial court's failure to correct any misperception that the prosecutor may have conveyed to the jury regarding the possibility of defendant's parole could lead the jury to erroneously believe that defendant could be released on parole. Accordingly, the Court held that when a prosecutor raises at sentencing the issue of defendant's future dangerousness and statutory provisions mandate life imprisonment without parole if defendant is not sentenced to death, the jury must be informed that the defendant will never be released on parole. *Simmons*, 512

U.S. at 168-69, 129 L. Ed. 2d at 145-46, 114 S. Ct. at 2195-96.

Defendant's reliance on *Simmons* is misplaced. The holding in *Simmons* addresses those situations where state law mandates that if the defendant is not sentenced to death, the only alternate sentence is natural life imprisonment. Here, if defendant was not sentenced to death, the court could have imposed any sentence within the permissible statutory range for the crime of murder. The rule in *Simmons* does not require a departure from this court's previous holdings that in a single-murder case, where the court could sentence defendant to various' terms of imprisonment if the jury did not impose the death sentence, it is error to inform the jury of all the possible sentences defendant could receive. See *Bean*, 137 Ill. 2d at 118.

### Constitutionality of Death Penalty

Defendant raises several challenges to the constitutionality of the Illinois death penalty statute (720 ILCS 5/9—1(g) (West 1992)). Each of defendant's claims, however, has previously been raised and rejected by this court, and we are not persuaded to reach a different result here.

Defendant first claims that the Illinois death penalty statute violates the eighth amendment by providing for the death penalty where evidence in mitigation is "not sufficient to preclude it." Defendant claims that the statute precludes a meaningful consideration of mitigating evidence. This court has repeatedly rejected this claim, and we do so again here. *People v. Page*, 155 Ill. 2d 232, 283 (1993); *People v. Mitchell*, 152 Ill. 2d 274, 345-46 (1992).

Defendant also contends that the Illinois death penalty statute is unconstitutionally vague because it allows a sentencing jury to consider "any other reason supported by the evidence why the defendant should be

sentenced to death." 720 ILCS 5/9—1(c)(West 1992). This court has consistently rejected this argument (*People v. Perez*, 108 Ill. 2d 70, 97-98 (1985); *People v. Young*, 128 Ill. 2d 1, 59 (1989)), and defendant does not offer any basis for reexamining this position.

Defendant next alleges that various aspects of the Illinois death penalty statute, in combination, invite the risk of arbitrary or capricious imposition of the death sentences. Defendant admits that this court has previously examined and rejected the constitutional challenges defendant raises. See *People v. Whitehead*, 116 Ill. 2d 425 (1987); *People v. Albanese*, 102 Ill. 2d 54 (1984); see also *Page*, 155 Ill. 2d at 284-85; *People v. Tenner*, 157 Ill. 2d 341, 390 (1993). Defendant suggests the previously rejected grounds for finding the statute unconstitutional, when considered cumulatively, render the statute unconstitutional. However, this court has held that if the individual aspects of the statute are constitutional, then it follows that the whole is constitutional. *People v. Phillips*, 127 Ill. 2d 499, 542-43 (1989).

## CONCLUSION

For the reasons stated, the judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Thursday, September 12, 1996, as the date on which the sentence of death entered in the circuit court of Cook County is to be carried out. The defendant shall be executed in the manner provided by law (725 ILCS 5/119—5 (West 1994)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is confined.

*Affirmed.*

JUSTICE HARRISON took no part in the consideration or decision of this case.