2019 IL App (1st) 151967
No. 1-15-1967
Opinion filed April 16, 2019

Second Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 9493 |
| | ) | |
| CLARENCE CLIFTON, | ) | Honorable |
| | ) | Anna Helen Demacopoulos, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court with opinion.
Justice Pucinski concurred in the judgment and opinion.
Justice Lavin concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    Before trial, Clarence Clifton moved to suppress three pretrial identifications on the ground that the police used unduly suggestive lineup procedures. The trial court denied the motion and, after a bench trial, convicted Clifton of armed robbery with a firearm. Clifton received a prison sentence of 35 years—20 years for the underlying offense and a mandatory 15-year add-on for the firearm. Although Clifton complained about his counsel's performance, the trial court proceeded without a preliminary inquiry into his concerns.

¶ 2    Clifton now challenges his conviction and sentence on four grounds: (i) the State failed to prove beyond a reasonable doubt that the object he brandished during the robbery met the statutory definition of "firearm," (ii) the trial court erred by denying his motion to suppress identification, (iii) the trial court improperly failed to conduct a preliminary inquiry into his posttrial claims of ineffective assistance of counsel as required by *People v. Krankel*, 102 Ill. 2d 181 (1984), and (iv) his 35-year sentence constitutes an abuse of discretion.

¶ 3    We find that the State presented sufficient evidence to prove the presence of a "firearm" beyond a reasonable doubt. We are mindful that the cross-reference in the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/1-1 *et seq.* (West 2012)) to the hyper technical definitions of "firearm" in the Firearm Owners Identification Card Act (FOID Card Act) (430 ILCS 65/0.01 *et seq.* (West 2012)) creates tension with well-established precedent allowing proof of a firearm on a single lay witness's testimony. But, this precedent controls given the specificity of the testimony about the object. We find, however, that the lineup procedures were unduly suggestive and agree that a remand is necessary to determine whether a sufficiently independent basis exists for the identifications made by the complainants. Because we vacate the denial of Clifton's motion to suppress and remand for further proceedings, we do not address his sentencing argument. We do, however, find his *Krankel* claim likely to recur on remand and agree with the parties that the trial court failed to conduct a proper *Krankel* hearing.

¶ 4                                  BACKGROUND

¶ 5    About 10:45 on a night in April 2012, two men walked up to Michael Smith, Victoria Tolbert, Ashley Lee, and Ciara Reed in an alley behind Smith's home. The two men robbed them of their belongings and fled.

¶ 6     Smith was standing around a car in the alley with Tolbert, Lee, and Reed. Two men walked past them, turned around and walked up to the group. One of the men said, "you know what this is, it's a robbery" and then "pointed a gun at [them]."

¶ 7     Smith described the gun as a black "revolver." In response to defense counsel's questions on cross-examination, he estimated the revolver to be either .32 or .38 caliber. The gun was not the first gun, .32-caliber or otherwise, Smith had seen. The man pointed the gun as close as one inch from Smith's face. The man took two phones from Smith's pants pocket. The other man took items from the women. The men then got into a Jeep and left.

¶ 8     Officer Matthews soon arrived, Smith's aunt having called police. Smith described the armed offender as having "[l]ong dreads *** a blue hoodie, all white low top Nikes, and a black Jeep." As to the second man, Smith could not describe him because he "was only focused on the guy who was in [his] face with the gun."

¶ 9     According to Tolbert, the two men walked by and then "walked back and grabbed [Smith] by the *** collar and put the gun to his head *** and waved the gun back and forth to him and me and told us that we know what this is approaching us to rob us." Tolbert described the gun as black but did not touch the gun or know what it was made of. While the first man held the gun on the group the whole time, the second man took Tolbert's cell phone and purse. Tolbert described the man with the gun to Officer Matthews as having "dreads" and wearing a blue or black hoodie and white shoes.

¶ 10    When the two men walked up, Lee was inside the car. Lee saw one of the men pointing a gun at Smith; she knows what a gun looks like, but could not tell what type of gun the man was holding or what it was made of. The second man told Lee to get out of the car, which she did.

The man with the gun pointed it at her and told her to take off her jacket. She complied. The second man reached into the car for Lee's purse. Lee told Matthews that the man with the gun wore "[w]hite gym shoes, jogging pants," and a dark black or blue hoodie. Also, the man "had a scar or a tattoo" on his face.

¶ 11                                    Lineup Identifications

¶ 12    Two days later, Smith, Tolbert, and Lee viewed lineups at the Harvey police station. They each testified at trial, along with Detective Banks, about the lineup procedures.

¶ 13    Banks identified lineup advisory forms signed by Smith and Tolbert. Lee also signed a form, but it had been lost. Banks identified State's Exhibit 1 as two photos of the five men in the lineup ultimately viewed by the witnesses sitting in the booking area where the lineup was conducted. The order of the lineup participants differed for each witness, but Banks confirmed that Exhibit 1 "fairly and accurately show[ed] how the people in the lineup appeared at the time of the lineup." Smith, Tolbert, and Lee identified Clifton as "the person that actually removed items from them."

¶ 14    Banks acknowledged that Clifton was the only person in the lineup whose dreadlocks hit his shoulders. He also acknowledged that Clifton was the only person with a mark on his face as he could not find anyone tattooed in that way.

¶ 15    Smith testified that when he viewed the lineup, Tolbert and Lee were present. Referring to Exhibit 1, he selected the person he identified at the lineup as Clifton and confirmed Clifton had the gun during the robbery. Regarding Clifton's appearance, Smith agreed that the only person in the lineup with long dreadlocks was Clifton and that Clifton was wearing "the same

hoodie he robbed us in, and the shoes." Smith also said that he did not take into consideration Clifton's clothes; he saw "who [he] knew did it for sure" and recognized his face.

¶ 16    Tolbert also described the lineup procedures. When asked to look at Exhibit 1, she identified Clifton in the photo as Smith had done and confirmed that Clifton was "[t]he one with the gun." Contrary to Smith's testimony, she had gone to the police station with the other two women and viewed the lineup alone. Like Smith, Tolbert agreed that of the men in the lineup, only Clifton had long dreadlocks and a mark on his face. Tolbert testified that the men in Exhibit 1 appeared in a different order during her lineup but that the photo showed the participants "the way they were in the lineup that [she] saw."

¶ 17    Lee could not recall whether she had been given any of the admonishments on the form but said nobody told her one of the robbers was in the lineup or urged her to pick any particular person. Lee, like Tolbert, testified that she was alone with just one other officer at the time of the lineup. Lee identified Clifton and, like Smith and Tolbert, said he "robbed [her]" and was "[t]he person who had the gun." Lee could not remember if she had seen other people in the lineup with tattoos but agreed that she could not see any on the other faces in Exhibit 1. Like Tolbert, Lee testified that the men in the photo in Exhibit 1 appeared in a different order for her lineup but that the photo showed "the way the lineup looked when [she] saw it."

¶ 18                    Motion to Suppress the Lineups

¶ 19    Before trial, Clifton moved to suppress the lineup identifications as unduly suggestive. The motion referred specifically to Clifton's long dreadlocks and tattoo and alleged that, as the only one with those features, the lineup's composition was suggestive. The court heard no testimony at the hearing; instead, the parties stipulated that there had been a prior description

given of "Suspect Number 1, male black, 5'9'' in height, dark complexion, long dreadlocks, no clothing description or age group available, armed with a black handgun." Counsels' argument, like the written motion, focused on Clifton being singled out by virtue of his long dreadlocks and a face tattoo.

¶ 20    The trial court, after viewing photographs of the lineup participants, found Clifton's dreadlocks were "not distinguishably longer than the other two" participants with dreadlocks. And that all the participants had their dreadlocks pulled back and that everything else, including height, complexion, and clothing appeared to be similar. The trial court could not see any mark on Clifton's face other than in the close-up booking photo. The court concluded that "[t]he police are not mandated to put people in a lineup that look exactly like the defendant," and denied the motion to suppress.

¶ 21    After the close of trial evidence, defense counsel renewed her motion to suppress identification. She reiterated concerns about Clifton's hair and tattoo, adding:

> "[A]s the testimony went on, it appeared that there were other factors, a dark hoodie, some white shoes that were supposedly told to the officers, but that even Miss Tolbert indicated when she looked at the pictures, oh, he has on the same thing he had on during the 'robbery.'
>
> And I think, Judge, that now we can also put in the fact that not only was he the only one that had long dreads and a mark on his face, but he also was the only one who had a dark hoodie and white shoes in that lineup.

And we are asking this Court to reconsider the decision made in the initial motion to suppress the identification testimony, because now new issues have come to light."

Defense counsel asked the court to take account of Smith's testimony that he viewed the lineup together with two witnesses and find the lineup procedure violated Clifton's rights.

¶ 22    The State responded that it was not "proper" to ask the court to consider testimony about the victims' descriptions of Clifton's clothes because the issue of Clifton's appearance had been litigated. The State dismissed Smith's testimony about the lineups' procedure as a "mistake" and argued that the other witnesses testified that they viewed lineups with only the detective present.

¶ 23    The trial court found nothing suggestive about Clifton's appearance, noting that in the lineups "there are similar hairstyles, there are similar heights, there are similar weights, there are similar clothing [*sic*]." On the lineup procedures, the trial court viewed each lineup as its own identification. Viewed that way, the trial court found that Lee and Tolbert's testimony established they were alone when they viewed the lineup. The trial court agreed with Clifton and found Smith's testimony warranted suppression of his lineup identification, but a sufficiently independent basis existed for his in-court identification. With the exception of Smith's lineup identification, the trial court denied the renewed motion to suppress.

¶ 24                        Posttrial Motions and Sentencing

¶ 25    Clifton was found guilty of armed robbery as to Smith, Tolbert, and Lee without any express factual findings. Defense counsel moved for a new trial disputing the court's guilty finding. The written motion omitted mention of counsel's motion to suppress the lineup identifications.

¶ 26    At the sentencing hearing, the judge heard arguments on the motion for a new trial. Counsel argued that "there were some questions about the black hoodie—black hoodie, long dreads, blue or black hoodie, white high tops, white shoes" and a problem with the identifications where Clifton was the only one in the lineup with "long dreads and a mark on his face." Counsel asked the court for "some serious reconsideration" in light of the trial testimony "to reconcile it with what was put forth to the Court in terms of the motion to suppress identification." The court denied the motion for a new trial, stating it "made the appropriate findings of fact in the motion to suppress identification."

¶ 27    The trial court sentenced Clifton to 35 years in prison, reflecting 20 years for the underlying offense and 15 years for the mandatory firearm add-on. Clifton's motion to reconsider his sentence was denied.

¶ 28                                    ANALYSIS

¶ 29    Clifton raises four issues: (i) the State failed to prove him guilty beyond a reasonable doubt because insufficient evidence indicates that the firearm he was accused of possessing met the statutory definition of a "firearm," (ii) his clothing and physical features made the lineup unduly suggestive, (iii) the trial court did not properly inquire when he raised *pro se* claims of ineffective assistance of counsel, and (iv) 35 years was excessive given the nature of the offense and the mitigation evidence.

¶ 30    The State responds that it presented sufficient evidence in the form of witness testimony, from which a reasonable fact finder could infer that Clinton had a "firearm." The State also disputes the suggestiveness of the lineup, as police are not required to find identical lineup participants and, in regard to Clifton, that would have been impossible. The State agrees with

Clifton that no inquiry was made into his *pro se* ineffectiveness claims and concedes the need for a remand. Finally, given the serious nature of the crime and Clifton's criminal history, the State asserts that his sentence amounted to a reasonable exercise of discretion.

¶ 31                                    Sufficiency of the Evidence

¶ 32    Armed robbery requires taking "property *** from the person or presence of another by the use of force or by threatening the imminent use of force" and doing so "armed with a firearm." 720 ILCS 5/18-1(a) (West 2012) (definition of robbery); 720 ILCS 5/18-2(a)(2) (West 2012) (armed robbery charge against Clifton). A violation of subsection (a)(2) carries a mandatory 15-year sentencing enhancement. 720 ILCS 5/18-2(b) (West 2012). For the purposes of the armed robbery statute, we derive the definition of "firearm" from the FOID Card Act. 720 ILCS 5/2-7.5 (West 2012) (referring to 430 ILCS 65/1.1 (West 2012)); see also *People v. Wright*, 2017 IL 119561, ¶ 71. The FOID Card Act defines "firearm" as "any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas" and exempts many types of guns including pneumatic guns, spring guns, paintball guns, BB guns, signal guns, and antique guns. 430 ILCS 65/1.1 (West 2012).

¶ 33    Proof a brandished object constitutes a firearm can be established by the testimony of a single eyewitness. *Wright*, 2017 IL 119561, ¶ 76. When analyzing a witness's testimony, we ignore a witness's subjective beliefs about the nature of the weapon. *People v. Ross*, 229 Ill. 2d 255, 277 (2008) ("[t]he trial court incorrectly based its ruling on the subjective feelings of the victim, rather than the objective nature of the gun"). *Wright* distinguished *Ross* on its facts (*Wright*, 2017 IL 119561, ¶¶ 74-76) without questioning its objective analytical framework. We

do not find any inconsistency in the propositions from those two cases. We can rely on the eyewitness testimony of a single witness, but that testimony must provide sufficient facts to allow one to objectively conclude that the object used in the robbery meets the statutory definition of a firearm.

¶ 34    Before addressing the facts, we clarify the precedential value of the cases cited and relied on by the parties. Central to the dispute in addition to *Ross* and *Wright* are *People v. Washington*, 2012 IL 107993 and *People v. Malone*, 2012 IL App (1st) 110517. The decisions in *Washington* and *Ross* analyze the sufficiency of the evidence to prove armed robbery under the statute before its amendment in 2000. See *Washington*, 2012 IL 107993, ¶¶ 5-7; *Ross*, 229 Ill. 2d at 257 (defendant's offense committed in 1999). Before January 1, 2000, the armed robbery statute had one requirement: a defendant commits robbery while he or she carried, or was otherwise armed with, a dangerous weapon. See Pub. Act 91-404, § 5 (eff. Jan. 1, 2000) (amending 720 ILCS 5/18-2). The amendment left the requirement of a dangerous weapon in place but made separate categories allowing for sentencing enhancements when a defendant possesses or uses a "firearm" in the course of a robbery. Pub. Act 91-404, § 5 (eff. Jan. 1, 2000); see also 720 ILCS 5/18-2(a)(1)-(4) (West 2012). The decisions in *Wright* and *Malone* analyze the sufficiency of the evidence to prove armed robbery under the current statute. *Wright*, 2017 IL 119561, ¶ 71; *Malone*, 2012 IL App (1st) 110517, ¶ 40. The courts in *Wright* and *Malone* discussed, but did not decide, the continued relevance of the analysis of the sufficiency in *Washington* and *Ross*. See *Wright*, 2017 IL 119561, ¶¶ 72-76; *Malone*, 2012 IL App (1st) 110517, ¶¶ 42-52.

¶ 35    A different panel in this division called *Ross* into question in *People v. Fields*, 2017 IL App (1st) 110311-B, on which the State relies. We respectfully disagree and find that cases

analyzing the preamendment armed robbery statute remain just as precedential after amendment. Recently, yet another panel in this division came to a similar conclusion. In *People v. Charles*, we noted that our supreme court's analysis in *Wright* expressly adopted the analysis of the preamendment statute in *Washington*. 2018 IL App (1st) 153625, ¶ 28. We find good reason to retain a consistent analysis postamendment of the armed robbery statute. In *Ross*, our supreme court defined "dangerous weapon" broadly, allowing proof that the weapon used be either (i) dangerous *per se*, as is a loaded gun; (ii) not necessarily dangerous but actually used in a dangerous manner; or (iii) not necessarily dangerous but capable of use in a dangerous manner. 229 Ill. 2d at 275. Under that expansive definition, the State need not prove that a gun was loaded and operable to be dangerous. *Id.* at 276. Instead, the State could meet its burden on the "dangerous weapon" element by showing the gun capable of use as a club or a bludgeon. *Id.*

¶ 36    By amending the armed robbery statute to require the presence of a "firearm," the General Assembly narrowed the scope of the offense by virtue of the Criminal Code's cross-reference to the FOID Card Act's stringent definition of firearms. The State needs to rely on more than the common sense notion that a firearm is dangerous because it is capable of being used dangerously; the State must prove that the object wielded during a robbery "is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas." 430 ILCS 65/1.1 (West 2012). The legislature then struck the balance by automatically increasing a defendant's sentence by 15 years when the State meets its heavy burden of proving the presence of a "firearm." 720 ILCS 5/18-2(b) (West 2012).

¶ 37    *Ross* and *Malone*, and other cases interpreting the preamendment armed robbery statute, still apply. In sum, the amendment of the armed robbery statute has made the State's burden

more onerous in armed robbery cases alleging the use of a firearm. If the State failed to meet its burden in *Ross*, where the statute allowed far more leeway in proving the presence of a "dangerous weapon," then *Ross*'s analysis is even more persuasive in cases with similar facts because the amended statute increased the specificity of proof required.

¶ 38    That said, we find the situation before us distinguishable from *Ross*. There, the victim was only able to describe the gun as black and "small, portable, and concealable." *Ross*, 229 Ill. 2d at 258, 276. The officer who recovered the gun expressly testified that it was a pellet gun. *Id.* at 276-77. By contrast, Smith gave far more specifics. He testified that the gun was black, a revolver, and either a .32 or .38 caliber. He had personally observed .32-caliber guns before. And, Smith testified that the gun was within one inch of his face.

¶ 39    Smith's testimony has a level of specificity like that in *Wright*. The witness testified about the color of the gun and explained that he had experience firing the exact type of gun he believed was used. *Wright*, 2017 IL 119561, ¶ 76. Plus, the witness felt the gun and described " 'something sharp' " being pressed into his back. *Id.* All of his observations led him to be " '100% sure' " that the weapon was "an 'actual firearm.' " *Id.* Smith described the gun by its color (black), type (revolver), and caliber (.32 or .38). Smith also had experience with the caliber of gun he believed Clifton possessed. While the witness in *Wright* testified to being subjectively 100% certain that the item was an actual firearm (*id.*), we need not rely on a witness's subjective belief about the nature of the firearm. *Ross*, 229 Ill. 2d at 277. Looking at the objective evidence provided by Smith compared to the testimony of the victim in *Wright*, we find sufficient evidence that the nature of the firearm was proven beyond a reasonable doubt.

¶ 40 Both the majority and concurrence in *People v. McLaurin*, 2018 IL App (1st) 170258, provide assistance. In *McLaurin*, the criminal offense, armed habitual criminal, also requires proof that the defendant possessed a "firearm" as defined in the FOID Card Act. *Id.* ¶¶ 1, 20-21. The court found the evidence insufficient to prove the defendant's possession of a "firearm" because the sole witness to see him with the gun, a police officer, testified that she saw what appeared to be a gun but could only provide details about color because all she observed was the handle and the barrel. *Id.* ¶ 26.

¶ 41 The majority in *McLaurin* distinguished armed robbery cases on the ground that "the underlying offense is robbery" and, to prove robbery, "there is no requirement to prove that a firearm was used in the taking." *Id.* ¶ 24. The majority, thus, found that use of a firearm during a robbery to be an "aggravating factor" and, as a result, the State had more leeway to prove the presence of a firearm by circumstantial evidence. *Id.* To the extent the *McLaurin* majority has implied a different standard of proof applies to a "firearm" in robbery cases as opposed to possession cases, we disagree. Instead, we adopt the approach of the special concurrence. See *id.* ¶¶ 33-36 (Mikva, J. specially concurring). The presence of a firearm undoubtedly presents more than an "aggravating factor" under subsection (a)(2) of the armed robbery statute; indeed, the State must prove it beyond a reasonable doubt. *Id.* ¶ 34; see also *Wright*, 2017 IL 119561 ¶¶ 70-71. While true that the State may be able to prove a firearm by different types of circumstantial evidence in an armed robbery case than in a possession case (*McLaurin*, 2018 IL App (1st) 170258 ¶ 24; see also *id.* ¶ 34 (Mikva, J. specially concurring)), the same definition of "firearm" applies in both the robbery and the possession contexts.

¶ 42    Again, we find Clifton's case distinguishable from *McLaurin*. The witness in *McLaurin* could only see the color of the gun and saw it from 50 feet away. *Id.* ¶ 26 (majority opinion). Smith testified to the color as well as the type of gun and caliber. And, the gun was an inch or so from Smith's face, giving him a substantially better opportunity to observe the gun up close than the officer in *McLaurin*.

¶ 43    Long-standing precedent allowing proof of a "firearm" based on the testimony of a single lay witness, coupled with the testimony actually elicited, compel our conclusion. But, we remain mindful that cross-referencing the Criminal Code and the FOID Card Act creates two particular evidentiary problems.

¶ 44    First, while the State carries the burden of proof beyond a reasonable doubt, the technical definition of a firearm in the FOID Card Act has led to decisions impliedly and improperly shifting the burden so the defense must disprove the presence of a statutorily defined firearm. For example, in *People v. Clark*, 2015 IL App (3d) 140036, ¶ 24, the appellate court took the defendant to task for failing to offer evidence that the gun was fake or some type of air rifle. And, in *People v. Hill*, 346 Ill. App. 3d 545, 548 (2004), the appellate court found that the defendant had forfeited his challenge to the sufficiency of the evidence by failing to present his own evidence that the gun was inoperable. A defendant can never forfeit his or her challenge to the sufficiency of the evidence proving an element of a criminal offense (*People v. Cregan*, 2014 IL 113600, ¶ 16), and it undermines due process by placing on defendants the burden to present evidence disproving the State's charge (*People v. Jeffries*, 164 Ill. 2d 104, 114 (1995) ("A defendant's due process rights are violated when the burden shifts to the defendant to disprove an element of the offense.")).

¶ 45    Our recognition of the State's burden leads to the second concern. Illinois courts hold that the State need not present physical evidence of a gun to establish the presence or use of a firearm. *People v. Jackson*, 2016 IL App (1st) 141448, ¶ 15 (citing *Washington*, 2012 IL 107993, ¶ 36). Absent some physical evidence, it seems almost impossible to prove that an item alleged to be a firearm meets the technical statutory definition unless fired. The FOID Card Act's definition of "firearm" requires the object to expel a projectile "by the action of an explosion, expansion of gas or escape of gas." 430 ILCS 65/1.1 (West 2012). No lay witness would ever be able to testify to this feature unless the gun was fired or the witness somehow had an opportunity to examine the gun. As Clifton suggests, the act exempts BB guns and other guns that "expel[ ] a single globular projectile not exceeding .18 inch in diameter." *Id.* Again, no lay witness would be able to confirm that the object brandished met this definition without examining the ammunition or seeing the weapon fired.

¶ 46    As the court indicated in *McLaurin*, and as the facts establish here, armed robberies pose a pernicious possibility that an offender will use a firearm (or even an object that looks like one) to force compliance with the robbery. 2018 IL App (1st) 170258 ¶ 24 (describing circumstances of offenses in *Washington* and *Wright*). But, the General Assembly has already accounted for that possibility with the aggravated robbery statute. Aggravated robbery involves taking property from the person or presence of another, "while indicating verbally or by his or her actions to the victim that he or she is presently armed with a firearm ***. This offense shall be applicable even though it is later determined that he or she had no firearm ***." 720 ILCS 5/18-1(b)(1) (West 2012). The General Assembly has addressed concerns like those expressed in *McLaurin* by creating an offense punishing an offender who attempts to coerce compliance by implying he or

she has a firearm. While precedent compels us to affirm Clifton's conviction, it appears the aggravated robbery statute more aptly describes Clifton's offense.

¶ 47   The FOID Card Act contains highly technical definitions and exemptions for "firearms." Those technical definitions have been imported wholesale into the Criminal Code for any offense that punishes the use or possession of a "firearm." It appears the General Assembly has crafted a careful balance, requiring the State to prove the technical presence of a firearm but allowing a much greater punishment should they be successful. We are troubled by the cases that allow for proof of a firearm with testimony that does not come close to describing the technical features of a firearm outlined in the FOID Card Act, but our supreme court has expressly approved of that type of testimony. Indeed, our supreme court has condoned convictions for armed robbery with far less specific testimony than is present here. So we affirm defendant's conviction.

¶ 48                               Suppression of Identification

¶ 49   Clifton argues that the trial court erred in denying his motion to suppress identification. He contends that the procedures used by the Chicago Police Department were unduly suggestive because Clifton was the only participant in the lineup wearing a dark sweatshirt and white shoes, which the witnesses described the offender as wearing. Clifton also refers to Smith's testimony indicating that Smith viewed the lineup at the same time as other witnesses. Finally, Clifton argues the witnesses' identifications were too unreliable to salvage any suggestiveness in the lineup procedures, although he conceded at oral argument that a remand for a hearing on whether there is an independent basis for the identifications would be appropriate if we find the record unclear or underdeveloped on this point.

¶ 50    The State preliminarily responds that Clifton forfeited his claim of suggestiveness of the lineup on account of dress. Alternatively, the State argues "no one person glaringly stood out from anyone else in the lineups," despite only Clifton wearing a dark sweatshirt and white gym shoes. As to Smith's identification, the State responds that the trial court suppressed his pretrial identification and that, even if Smith viewed the lineup with the others, the record shows no impact on their independent identifications. Finally, the State contends the witnesses' ability to identify Clifton was independently reliable even if the lineup was suggestive and also proposes the alternative remedy of a remand for a fuller exploration.

¶ 51    As we will explain, we partially agree with Clifton. After reviewing the lineup photographs and the testimony regarding the lineup procedures, we find the lineup was unduly suggestive. We do not agree, however, that the record is sufficiently developed to review the question of whether the identifications are sufficiently independent to be admissible. Critically, a finding that the lineups are suggestive shifts the burden to the State, but because the trial court did not find the lineup suggestive in the first instance, the State had no opportunity to attempt to satisfy its burden. Therefore, we vacate the trial court's judgment and remand for a hearing on the independent reliability of the identifications.

¶ 52                                   Forfeiture

¶ 53    The State initially argues that Clifton has forfeited his claim. We disagree. To preserve an issue for review, a defendant must object to the alleged error when it occurs and raise the issue in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). The forfeiture rule protects (i) respect for the trial court as the tribunal with the primary responsibility to make findings of fact and render initial judgments, (ii) time and judicial resources by heading off appeals of

nonmeritorious claims, and (iii) against unfair surprise to the State who may otherwise hear of an issue for the first time on appeal. See *id.* at 188 (citing *People v. Irwin*, 32 Ill. 2d 441, 443-44 (1965)). An oral motion protects the interests served by a written motion as long as the State waives the requirement of a written motion by not objecting or arguing the motion anyway. *People v. Edwards*, 241 Ill. App. 3d 839, 843 (1993) (citing *Enoch*, 122 Ill. 2d at 188); *People v. Todd*, 249 Ill. App. 3d 835, 840-41 (1993).

¶ 54     The State's forfeiture argument is twofold. The State asserts that Clifton did not "properly or fully" litigate the suppression issue in the trial court because he only asserted a problem with the lineup based on a "tattoo and dreadlocks." Alternatively, the State argues that Clifton did not include his suppression claim in his written posttrial motion. The State acknowledges that Clifton orally argued the suppression issue during the hearing on the motion for a new trial but repeats its argument that the hearing focused on the tattoo and dreadlocks. We find both arguments unsupported by the record.

¶ 55     The State correctly notes that the original motion to suppress identification did not raise a specific claim about the victims' description of the offender's clothing. But, the first argument about the motion to suppress reveals the reason. At the time of the filing and argument on the original motion, defense counsel relied on information in the police reports, which described the offender with the gun as: "Suspect Number 1, male black, 5' 9'' in height, dark complexion, long dreadlocks, no clothing description or age group available, armed with a black handgun." So, at the time the initial motion, no facts available to defense counsel supported an argument about Clifton's clothing during the lineup.

¶ 56    Then, at trial, all three witnesses testified about the offender's clothing. At the close of evidence, defense counsel argued that new information had come forward "that not only was [Clifton] the only one that had long dreads and a mark on his face, but he also was the only one who had a dark hoodie and white shoes in that lineup." While the State characterized the argument based on this additional information as "improper," the trial court did consider the additional information when it denied counsel's renewed motion to suppress. In ruling, the trial court referred to "Mr. Clifton's physical appearance" generally and found that all of the participants in the lineup had similar hairstyles, similar height and weight, and similar clothing. The trial court's ruling on the renewed motion to suppress considered and incorporated counsel's arguments based on the additional information about Clifton's clothes.

¶ 57    Turning to the posttrial litigation about the motion to suppress, again, the State correctly states that trial counsel's written motion contains no mention of Clifton's suppression claim. That said, the parties amply litigated the claim at the hearing on the posttrial motion. As part of counsel's argument about identification, she said, "there were some questions about the black hoodie *** long dreads, blue or black hoodie, white high tops" and "each and every of these three witnesses told this Court *** that the defendant was the only person—the only person in those lineups that had long dreads and a mark on his face." The State responded, "we believe that the Court's ruling of the pretrial motion on the lineup was appropriate." Defense counsel tried to reply, but the court interjected, "I don't need to rehear what you've already reargued five times, [counsel]." The trial court then allowed counsel to adopt the arguments she made at the motion hearing at the close of the State's evidence. Ultimately, the court denied the motion for a new

trial, stating, "I do believe the Court made the appropriate findings of fact in the motion to suppress identification ***."

¶ 58    The State's insistence that the issue has been forfeited would require us to adopt an unreasonably strained reading of the record. The litigation of the motion to suppress identification gave the trial court the opportunity to make both factual and legal rulings, gave the State an opportunity to respond, and refined the scope of the issue for our review. See *Enoch*, 122 Ill. 2d at 188. The application of forfeiture would be particularly unfair given the State's participation on the issue of suppression at every stage of the proceedings in which the issue arose. Clifton has sufficiently preserved this claim.

¶ 59                          Merits of the Motion to Suppress

¶ 60    Identifications made at a lineup always present "the possibility of unfairness to the accused in the way a lineup is conducted." *Foster v. California*, 394 U.S. 440, 442 (1969). So, a two-part framework has been developed. First, the defendant bears the burden to show the pretrial lineup as "impermissibly suggestive." *People v. McTush*, 81 Ill. 2d 513, 520 (1980). If the defendant successfully makes the showing, the burden shifts to the State to present clear and convincing evidence that "the witness is identifying the defendant solely on the basis of his memory of events at the time of the crime." (Internal quotation marks omitted.) *Id.* We review the totality of the circumstances surrounding the identification (*People v. Lawson*, 2015 IL App (1st) 120751, ¶ 39) and may look to facts adduced at both the suppression hearing and trial (*People v. Gill*, 2018 IL App (3d) 150594, ¶ 76 (citing *People v. Brooks*, 187 Ill. 2d 91, 127-28 (1999) (where defendant seeks reconsideration of suppression rulings posttrial, appellate court may consider both hearing and trial testimony)).

¶ 61    We employ a two-part standard of review. We adopt the trial court's factual findings unless they are against the manifest weight of the evidence and review the ultimate legal question of whether suppression is warranted *de novo*. *Lawson*, 2015 IL App (1st) 120751 ¶ 39.

¶ 62    Clifton's primary argument contends that the lineup was unduly suggestive because only Clifton appeared in the lineup with dreadlocks, a dark hoodie, and white shoes, the description given by the victims of the offender with the gun. At first blush, the weight of authority in Illinois appears to reject this argument—a substantial body of case law upholds a lineup when a suspect wears clothing described to police by the victims. *People v. Peterson*, 311 Ill. App. 3d 38, 49-50 (1999) (collecting seven cases holding similarly). But, Clifton's identification is unique relative to this body of case law. We are not presented with a situation where a defendant, described only as wearing one particular item or having one particular physical feature, appears in a lineup with the piece of clothing or physical attribute. Instead, both the lineup photograph presented at the suppression hearing and the hearing testimony itself confirms that Clifton was described, and later presented, as the only participant in the lineup with three particular articles of clothing, a unique hairstyle, and a facial feature matching the description of the offender. On these facts, we find the lineup was unduly suggestive.



Exhibit 1, which the State showed to all three witnesses at trial.

¶ 63    While the law "does not require that lineups and photographic arrays *** include near identical or look alikes of the witnesses' descriptions," if the defendant is the only one in the lineup required to wear the clothing that the suspect reportedly wore the lineup may be unduly suggestive. *People v. Johnson*, 149 Ill. 2d 118, 147 (1992) (citing *United States v. Wade*, 388 U.S. 218, 233 (1967)). We view the suggestiveness of the lineup in light of the totality of the circumstances, with our focus on "the strength of [the] suggestion made to the witness." *Id.* In his brief and at oral argument, Clifton emphasized the multiple similarities between his prior description and his appearance in the lineup arguing that they made the lineup strongly suggestive. We agree.

¶ 64    The State argues that lineup participants need not be "physically identical" for a lineup to be fair. In support, the State cites *People v. Simpson*, 172 Ill. 2d 117 (1996), *Peterson*, 311 Ill. App. 3d 38, *People v. Johnson*, 222 Ill. App. 3d 1 (1991), and *People v. Coleman*, 203 Ill. App.

3d 83 (1990). We find the simplest way to explain our conclusion is to distinguish the cases on which the State relies.

¶ 65    In *Simpson*, the complaining witness described the suspect as having curly hair. 172 Ill. 2d at 139. The defendant was one of five black males to be included in a lineup in which every participant "had similar skin tone, had moustaches, fairly short hair and wore casual clothing." *Id.* Each participant was between 5 feet, 9 inches, tall and 6 feet, 1 inch, tall and between 144 and 210 pounds; the defendant was 5 feet, 11 inches, tall and weighed 179 pounds. *Id.* The defendant was, however, the only participant with curly hair. *Id.* The supreme court found the lineup to be proper because the defendant's hairstyle was not "so distinctive as to render the lineup suggestive." *Id.* at 140.

¶ 66    In *Peterson*, the suspect was described as having pink rollers in his hair and the defendant, though he had long hair, had it "covered by [a] baseball cap." 311 Ill. App. 3d at 49. The defendant was not wearing pink rollers in the lineup. *Id.* at 47. The defendant was also the only participant to appear in the lineup in an "unremarkable gray sweatshirt" after the suspect had been described as wearing one. *Id.* at 47, 49. We found the sweatshirt, given the totality of the circumstances, was not sufficient to render the lineup suggestive. *Id.* at 49-50.

¶ 67    In *Johnson*, the defendant was arrested in red pants and placed in the lineup while wearing those pants. 222 Ill. App. 3d at 7-8. The complaining witness had previously said the suspect wore red pants. *Id.* at 7. The defendant, who was black, was in the lineup with several other men who were black and every person in the lineup wore "causal or informal clothing." *Id.* This court found the lineup was not suggestive because everyone in the lineup was "basically

similar in appearance" and the police were not obligated to provide the defendant clothing other than what he was arrested in. *Id.* at 8.

¶ 68    Finally, in *Coleman*, the defendant was the only person in the lineup wearing a dark shirt where the complaining witness "had told the police that the [suspect] was wearing a *dark* shirt at the time of the offense." (Emphasis in original.) 203 Ill. App. 3d at 91. This court found that the mere fact that the defendant was wearing a black shirt while the suspect had been described as wearing a dark shirt did not render the lineup suggestive. *Id.* at 91-92.

¶ 69    The critical theme running through these cases is that one distinct feature, standing alone, is not sufficient to render a lineup suggestive where the participants in the lineup otherwise have substantially similar appearances. In stark contrast to these earlier decisions, Clifton is the only person present in the lineup that has the precise combination of several features described by the witnesses.

¶ 70    The witnesses consistently described Clifton as having dreadlocks, a dark (black or blue) hoodie, and white gym shoes. Lee also described Clifton's pants as "jogging pants." There are multiple men in the lineup photo that have dreadlocks, but of them only Clifton has dreadlocks and hoodie. There are multiple men that have "jogging" pants or sweatpants, but Clifton is the only one of them also wearing white shoes. There is one other man in a dark colored hoodie, but of the two, only Clifton has dreadlocks and white shoes. Indeed, no other lineup fillers had white shoes. It is not simply that Clifton was wearing clothing described by the witnesses—he was the only one in the lineup that appeared consistent with every feature that the witnesses had provided in their descriptions of the suspect.

¶ 71    Given the sheer number of characteristics that Clifton matched exactly, we find his reliance on *People v. Maloney*, 201 Ill. App. 3d 599 (1990), persuasive. There, the defendant appeared in a lineup with four other men. *Id.* at 606. Three men wore pressed white shirts, pressed grey slacks, socks and shoes, and wristwatches. *Id.* The fourth man wore a pressed pullover shirt, pressed jeans, socks and shoes, and a wristwatch. *Id.* at 606-07. The defendant, however, wore a brown or extremely dirty shirt, wrinkled blue slacks, shoes with no socks, and no wristwatch. *Id.* at 607. The defendant, overall, appeared unkempt compared to the well-dressed and well-groomed men who accompanied him at the lineup. *Id.* Along with the stark contrast in dress, a "difference in physical size" existed among the lineup participants. *Id.* This court found that the lineup procedure "all but hung a sign saying 'pick me' around defendant's neck." *Id.*

¶ 72    We find similar spotlighting here. The defendant in *Maloney* stuck out because he was dressed in a completely unique manner from the other lineup participants; in Clifton's case, while his clothes may fit in with the general style worn by the other participants, only Clifton's appearance matches precisely the descriptions given by the witnesses as to several articles of clothing and at least two aspects of his physical appearance. Clifton argues in his brief, "If one hundred people were asked to view the lineup and choose which participant was not like the others, there is no question that all one hundred would choose Clifton." In most cases, we might be inclined to disagree with such a broad statement, but on the facts only a minor modification makes it accurate: if one hundred people, *who knew of Clifton's earlier description*, were asked to view a lineup and choose which participant was not like the others, we find it highly probable that they would pick Clifton.

¶ 73     The dissent asserts that

> "[i]f one is looking to identify somebody in [Exhibit 1] who is unlike the others, one need only look next to [Clifton], where a young man with a short-cropped haircut sits, wearing an unzipped hoodie that pointedly reveals his bare chest. One might say he looks different, but even he is approximately the same age, height, and weight as the others."
>
> *Infra* ¶ 100.

But Smith, Tolbert, and Lee did not describe their assailant as having "a short-cropped haircut" or wearing an "unzipped hoodie" with no shirt underneath. This young man may be the stand-out participant for an observer unimpeded by a prior description they gave, but here Clifton stands out because he matches previous descriptions in several unique ways. The question is not who among the participants is least like the others; the question is who among the participants is most like the previous descriptions. And the answer is Clifton.

¶ 74     The dissent's only answer is to juxtapose Exhibit 1 with photos that were not introduced at trial or ever shown to any witnesses. *Infra* ¶ 100. This is critical because every witness who testified explained that Clifton appeared in the lineup *as he appeared in Exhibit 1*. So, Clifton may have appeared differently at some point while he was in police custody, but that simply does not matter for our purposes because we know that when the witnesses viewed their lineups, Clifton appeared as he did in the only photo admitted at trial, which does not show an unzipped hoodie.

¶ 75     For similar reasons, we distinguish the cases the State relies on to argue, "differences in physical characteristics have likewise been held not enough to render a lineup or photo array suggestive." *People v. Daniel*, 2014 IL App (1st) 121171, ¶ 15 (finding none of defendant's

claims about suggestiveness persuasive where "all [of the subjects]—including defendant—match [the victim's] general description"); *People v. Allen*, 376 Ill. App. 3d 511, 521 (2007) (defendant was only person in lineup who was bald, but hair was only unique characteristic and other participants had closely cropped hair anyway); *People v. Johnson*, 104 Ill. App. 3d 572, 578-79 (1982) (only noticeably unique aspect of defendant's appearance was that he was balding, an attribute not visible to witness at lineup because defendant was wearing bandana). Again, even though other participants in Clifton's lineup had dreadlocks or braided hair, none of the others had hoodies or white shoes and it appears only one of them may have been wearing "jogging pants" or sweatpants. It is the fact that Clifton is the only person matching every aspect of the previous description that renders his lineup unduly suggestive.

¶ 76     On a more pragmatic level, the State argues that we should not find the lineup suggestive because Clifton simply wore the clothes in which he was arrested and the officers "did not tell [him] what to wear." In support, the State cites *People v. Faber*, 2012 IL App (1st) 093273, ¶ 57, where we found no suggestiveness in a lineup even though the defendant was the only person wearing a sleeveless white T-shirt as the victim had described. But, the sleeveless white T-shirt was the only purportedly unique feature about the defendant matching his previous description and other participants in the lineup were wearing short sleeved white T-shirts. *Id.* Clifton's case of course, differs—his appearance matched the previous description in many particulars. We find this case surpasses the limits of police taking suspects as they find them.

¶ 77     At oral argument, Clifton's counsel clarified that there was little that officers could have done about the tattoo on his face. Our review of the photos suggests that Clifton's tattoo may not even have been visible from the distance at which the witnesses were viewing the lineup. Indeed,

the tattoo appears faintly visible in Clifton's close-up booking photo. Clifton's counsel also agreed that his tattoo is not a major factor in the analysis. Given the suggestiveness present in the remainder of Clifton's appearance, we agree.

¶ 78    The suggestiveness of Clifton's lineups was substantial; the necessary fixes were relatively easy. Clifton's tattoo aside, the officers need not have gone to extraordinary measures to prevent suggesting Clifton as the offender. They certainly need not have, as the dissent suggests, taken a "shopping trip to Target." *Infra* ¶ 102. Tucking in Clifton's hood, taking all of the participants' shoes off, and providing hats to Clifton and the fillers would have sufficed. Indeed, it appears that police stations in Chicago follow these types of procedures as a matter of routine practice. See *People v. Brown*, 2017 IL App (1st) 143719-U, ¶ 6 ("police gave all lineup participants hats to disguise their hairstyles" where offender was described as having braided hair); *People v. Smith*, 2016 IL App (1st) 133811-U, ¶ 6 ("due to defendant's braided hair and the large tattoos on his face, in order to make the lineup fair and not suggestive, all of the participants had bandages on their faces and wore baseball hats"). We do not cite these decisions for their precedential value, because of course they have none (see Ill. S. Ct. R. 23(e) (eff. July 1, 2011)), only as examples to dispel the practical concern the dissent has that it would be onerous for police to remedy the obvious differences in Clifton's appearance. See *People v. Carr*, 2013 IL App (3d) 110894, ¶ 29 n.2 (Schmidt, J. specially concurring) (citing Rule 23 order as an example, not as authority).

¶ 79    Again, the dissent responds to this point by referring to photos that were not introduced at trial. *Infra* ¶ 102. The witnesses confirmed that Exhibit 1 shows Clifton as he appeared during their lineups. Detective Banks, looking at Exhibit 1, agreed that Clifton was one of two people in

a dark hoodie. Importantly, Clifton did not supplement his claim about the suggestiveness of his lineup with arguments about his clothing until after the witnesses confirmed that he appeared as he did in Exhibit 1. Any suggestion that Clifton's hood may have been tucked-in in other photos is irrelevant where no witness testified that Clifton appeared as he did in the other photos at the time of the lineups. *Cf. People v. Thomas*, 199 Ill. App. 3d 79, 88 (1990) (error for trier of fact to consider exhibits not introduced into evidence).

¶ 80    While not dispositive, we also find it illuminating the Chicago Police Department expressly instructs its officers that "[s]uspects in a lineup should not appear to be substantially different from fillers *based on the eyewitness's previous description of the perpetrator* or based on other factors that would draw attention to the suspect. For example, fillers should be the same race, sex, approximate height, weight, age, and physical appearance and be *similarly clothed*." (Emphases added.) Chicago Police Department, Special Order S06-02 § 2(F)(3) (eff. Jan. 1, 2016)        (http://directives.chicagopolice.org/directives/data/a7a57be2-12be97cf-78912-be98-99723f421ce10458.html?hl=true) [https://perma.cc/3AU9-EUKU]. (We acknowledge that the effective date of this special order comes after the time at which Clifton's lineup was administered. But, according to the notations about amendments in the order, it appears this language existed in earlier versions.)

¶ 81    Of primary importance, it appears that Chicago police officers are aware that they are to carefully ensure, when constructing a lineup, that any difference between an offender and a filler is not related to the descriptions given by witnesses. Here, the State does not dispute that the officers were aware of the description that Smith, Tolbert, and Lee had given and that no

remedial steps were taken to ensure that Clifton's appearance did not set him apart based on those descriptions.

¶ 82    We reiterate that under Illinois law, the mere fact that a suspect appears in the lineup with one article of clothing or distinctive feature that matched his or her description does not render a lineup suggestive. Our conclusion is limited to its facts—the sheer number of Clifton's features matching the witnesses' descriptions compels our result.

¶ 83    Turning to remedy, as we have said the parties now agree that a remand is appropriate to allow the trial court to evaluate the independence of the witnesses' identifications in the first instance. We agree. As we have set out, a defendant bears the initial burden to establish that the identification procedures are suggestive. *McTush*, 81 Ill. 2d at 520. Once he or she does that, the State must prove "by a clear and convincing showing, based on the totality of the surrounding evidence, that the witness is identifying the defendant solely on the basis of his [or her] memory at the time of the crime." (Internal quotation marks omitted.) *Id.* Here, the trial court did not find the identification procedures suggestive in the first instance, and so the burden never shifted to the State. As a result, the State did not have the opportunity to provide evidence to meet its burden to show an independent basis for the identifications. As we are a court of review, not first view, we find a remand appropriate.

¶ 84    The dissent is "puzzled" that we would choose to remand to afford the State an opportunity to meet its burden and allow the trial court to make findings of fact in the first instance. But, as the dissent points out, we *may* consider the independence of witness identifications for the first time on appeal if the record is sufficiently developed. See *Brooks*, 187 Ill. 2d at 129. What we may do, however, is not always what we should do. Here we see no

judicial economy rationale for doing so ourselves. We are remanding—as the dissent agrees we should—for a preliminary *Krankel* hearing. So, this case will already be before the trial court once again.

¶ 85    We vacate the trial court's denial of Clifton's motion to suppress identification. In accordance with our review of the record and the parties' agreement as to remedy, we remand for the trial court to conduct a hearing to determine whether there is a sufficiently independent basis on which to find the complainants' identifications of Clifton reliable.

¶ 86                                        *Krankel*

¶ 87    Given our resolution of Clifton's suppression claim, we might ordinarily put off deciding his *Krankel* claim. But, as we will discuss, the ineffectiveness that formed the basis of Clifton's *pro se* claims stemmed from counsel's purported failure to interview witnesses and discuss the case with Clifton. While the trial court's disposition of the suppression motion on remand might alter the contours of any claim of ineffectiveness, we find the claims that Clifton has already presented are likely to recur on remand and likely to be the same regardless of the outcome of the suppression motion. As a result, we address his *Krankel* argument now.

¶ 88    Clifton argues that the trial court erred by failing to conduct the preliminary inquiry set out in *Krankel*, 102 Ill. 2d 181. The State argues, "[t]his record does not necessarily reflect an express claim of ineffective assistance of counsel," but ultimately concedes that the trial court failed to flesh out the facts underlying Clifton's ineffectiveness claims. We agree with the parties that no proper *Krankel* hearing took place and find that the record unambiguously compels that conclusion.

¶ 89    Following *Krankel*, when a defendant brings his or her *pro se* claims of ineffective assistance to the trial court's attention, the court must make a preliminary inquiry into the claim's factual bases. *People v. Ayres*, 2017 IL 120071, ¶ 11. The trial court may rely on its own knowledge of trial counsel's performance and, if necessary, ask questions of trial counsel and the defendant. *Id.* ¶ 12. If the trial court determines that the claims lack merit, it may deny the defendant's motion. *Id.* ¶ 11. But, if the trial court finds possible neglect, the court may appoint new counsel to represent the defendant while further litigation about counsel's alleged ineffectiveness takes place. *Id.* We review questions of the trial court's compliance with *Krankel* procedures *de novo*. *People v. Jolly*, 2014 IL 117142, ¶ 28.

¶ 90    Here, Clifton made specific allegations of ineffectiveness claiming his counsel failed to investigate witnesses and did not come to see him to discuss the case. The trial court did not attempt to uncover the factual bases of those claims, declining to appoint new counsel and describing Clifton's lawyer as "a very capable public defender." We find Clifton's dialogue with the court satisfies the requirements to trigger a preliminary *Krankel* inquiry. See *People v. Lobdell*, 2017 IL App (3d) 150074, ¶ 37 (requiring defendant to use magic words—"ineffective assistance of counsel"—would elevate form over substance). The parties agree, as do we, that no preliminary *Krankel* inquiry took place.

¶ 91    Affirmed in part and vacated in part.

¶ 92    Cause remanded.

¶ 93    JUSTICE LAVIN, concurring in part and dissenting in part:

¶ 94    The majority has held that the lineup in which defendant was identified was "unduly suggestive," resulting in a remand for a "hearing to determine whether there is a sufficiently

independent basis on which to find the complainants' identifications of Clifton reliable." I disagree and respectfully dissent, as I find that the trial court correctly found the police lineup evidence was fair to defendant.

¶ 95     At trial, the victims testified that they were confronted by a gun-wielding young man who took their possessions on April 17, 2012, shortly before midnight. That evening, three of them gave investigating Officer Matthews of the Harvey Police Department detailed descriptions of the perpetrator of this crime, including his approximate age, his race, a facial scar or tattoo, his hairstyle, and what he was wearing. The following morning, three of the victims discussed the encounter again with police. At that point, police decided to contact the cell phone provider for Smith's phone to see if it could employ technology to identify the phone's current whereabouts. Police quickly learned that the phone was in use on the south side of Chicago, and they went to an address on Carpenter Street, where they found defendant in possession of the cell phone in question. As fate would have it, defendant was apparently dressed in the same clothes that he wore the previous evening when the robbery occurred. Police kept defendant in custody and arranged lineups for the following day.

¶ 96     The trial court found nothing inherently suggestive about defendant's appearance, finding similarities in hairstyles, height, weight, and clothing. Smith testified that he was with Lee and Tolbert when he viewed the lineup, but the trial court found that Lee and Tolbert's testimony established they were each alone when they viewed the lineup. The trial court agreed with defendant and suppressed Smith's statement of his lineup identification, but a sufficiently independent foundational basis permitted his in-court identification. With the exception of Smith's lineup identification, the trial court denied the renewed motion to suppress.

¶ 97    After reviewing the lineup photos and the related testimony regarding the lineup procedures from the suppression hearing and the trial, the trial court's factual findings were not against the manifest weight of the evidence. The defendant clearly did not satisfy his burden of showing that the lineup identifications were unduly suggestive. The trial court specifically noted that the participants in the lineup shared a number of similar characteristics, giving confidence that the identifications depended upon the memory of the witnesses and not the composition of the lineup. Identifications made at a lineup always present "the possibility of unfairness to the accused in the way a lineup is conducted." *Foster v. California*, 394 U.S. 440, 442 (1969). As a result, a two-part framework has been developed. First, the defendant bears the burden to show that the pretrial lineup was "impermissibly suggestive." *People v. McTush*, 81 Ill. 2d 513, 520 (1980). If the defendant successfully makes the showing, the burden then shifts to the State to present clear and convincing evidence that "the witness is identifying the defendant solely on the basis of his memory of events at the time of the crime." (Internal quotation marks omitted.) *Id.* Our analysis reviews the totality of the circumstances surrounding the identification. *People v. Lawson*, 2015 IL App (1st) 120751, ¶ 39. And we may look to facts adduced at both the suppression hearing and trial. *People v. Gill*, 2018 IL App (3d) 150594, ¶ 76 (citing *People v. Brooks*, 187 Ill. 2d 91, 127-28 (1999) (where the defendant seeks reconsideration of suppression rulings posttrial, we may consider both hearing and trial testimony)).

¶ 98    A two-part standard of review is utilized where we would disturb the trial court's factual findings only when they are against the manifest weight of the evidence, and we review the ultimate legal question *de novo*. *Lawson*, 2015 IL App (1st) 120751, ¶ 39.

¶ 99     Defendant contends, in the main, that the lineup was unduly suggestive because only he appeared in the lineup with dreadlocks, a dark hoodie, and white shoes, which is how the victims described the offender with the gun. The weight of authority in Illinois would clearly reject this argument. A substantial body of case law upholds the admissibility of lineup identification evidence when a suspect wears clothing described to police by the victims. *People v. Peterson*, 311 Ill. App. 3d 38, 49-50 (1999) (collecting seven cases holding similarly). Having reviewed the lineup photos presented at the suppression hearing and at trial, I agree with the trial court's determination that defendant's clothing did not single him out to a degree to make the lineup suggestive.



Exhibit 1, which the State used at trial.

A careful analysis of the lineup photograph used at trial reveals five African American men who look to be around the same age. Defendant is seated at the left (next to the desk) in this particular exhibit. All five are dressed in casual clothing. Three of the five (including defendant) have dreadlocks or braided hair. Four of the five (including defendant) have facial hair. No facial scars

or tattoos are discernible in the photograph, but there was testimony that only defendant had a tattoo on his left cheek. Two of the men (including defendant) are wearing dark hoodies and while it is not observable in the photograph, testimony at trial established that defendant was the only person in the lineup wearing white sneakers. Defendant's argument that these factors resulted in an unduly suggestive lineup is quintessentially specious.



¶ 100  Defendant complains that "[i]f one hundred people were asked to view the lineup and choose which participant was not like the others, there is no question that all one hundred would choose [him]." This is patently absurd. If one is looking to identify somebody in this photograph who is unlike the others, one need only to look next to defendant, where a young man with a short-cropped haircut sits, wearing an unzipped hoodie that pointedly reveals his bare chest. One might say he looks different, but even he is approximately the same age, height, and weight as the others. The majority takes issue with this, stating, "[t]he question is not who among the

participants is least like the others; the question is who among the participants is most like the previous descriptions" and asserts that the complainants' never described their assailant as "wearing an 'unzipped hoodie.' " Yet, in several of the lineup photos presented at the suppression hearing, defendant is wearing an unzipped hoodie. Thus, defendant is neither "least like the others" nor "most like the previous descriptions." Undaunted, defendant cites (and the majority relies upon) *People v. Maloney*, 201 Ill. App. 3d 599, 607 (1990), and argues that his lineup appearance "all but hung a sign saying 'pick me' around [his] neck," as the *Maloney* court found. This ill-considered and hyperbolic gambit is easily debunked by even a cursory comparison to *Maloney*, which at the admitted risk of considerable judicial understatement, is distinguishable.

¶ 101   In *Maloney*, the defendant appeared in a lineup with four other men. *Id.* at 606. Those four happened to be detectives, as the investigating officers were said to be "unsuccessful" in their attempts to locate similar-looking arrestees from nearby police stations. *Id.* at 605. Three wore pressed white shirts, pressed grey slacks, socks and shoes, and wristwatches. *Id.* at 606. The fourth wore a pressed pullover shirt, pressed jeans, socks and shoes, and a wristwatch. *Id.* 606-07. By contrast, the defendant had an undeniably disheveled appearance, wearing a brown (or extremely dirty) shirt, wrinkled blue slacks, shoes sans socks, and no wristwatch. *Id.* at 607. The defendant, overall, appeared unkempt compared to the well-dressed and well-groomed law enforcement professionals who sat with him at the lineup. *Id.* Along with the stark contrast in dress, a "difference in physical size" existed among the lineup participants, with the defendant possessing a Lilliputian body habitus as compared to the others. *Id.*

¶ 102    Suffice it to say, the composition of this lineup is wholly dissimilar to that in *Maloney*. Here, all participants were dressed casually, two with dark hoodies and three had hair styled with dreadlocks or braids. All five men are similar in height, weight, and complexion. Far from being suggestive, this lineup is a veritable paragon of propriety that could only have been surpassed by a police shopping trip to Target in order to dress defendant so he wasn't wearing the clothes he had on when he was arrested. Bluntly put, there is no duty for police to change a suspect's clothing or to dress other members of a lineup in the same manner as the suspect. The majority proposes the police in this case could have mitigated the suggestiveness of the lineup by, among other things, "[t]ucking in Clifton's hood." *Supra* ¶ 78. Looking at the following lineup photos presented at the suppression hearing, however, it appears they did just that. A careful review of the two photos reveals that defendant is wearing a zipped hoodie with a logo in one, but not in the other. Thus, either defendant's hood was tucked in or he was wearing a different sweatshirt.



¶ 103    Since the offender was described as wearing a blue or black hoodie *and* white shoes, defendant contends that that the lineup was unduly suggestive because *only he* wore a dark hoodie *and* white shoes and because he is the only one with dreadlocks and a facial tattoo. These

sorts of situations are not uncommon, however, and as the trial court here stated, "defendant made the decision to make himself very unique looking and that is what he has to live with."

¶ 104   In *People v. Lopez*, 93 Ill. App. 3d 152, 160 (1981), the defendants asserted that a lineup was unduly suggestive because they were wearing the same clothing as that said to have been worn by the perpetrators. The court noted that "[a]pparently, defendants were arrested with these clothes, and there is no evidence that the police forced them to wear this clothing." *Id.* As a result, the court found that "there can be no claim of impermissible suggestiveness." *Id.*

¶ 105   Similarly, in *People v. Woods*, 114 Ill. App. 2d 348, 356 (1969), the defendant in the lineup was wearing the same clothing that he wore upon his arrest. Although the victim stated that the jacket and trousers worn by the defendant during the lineup were the same as those worn during the crime, this did not render the lineup unduly suggestive. *Id.*; see also *People v. Hughes*, 259 Ill. App. 3d 172, 174-75, 177 (1994) (upholding a one-person show-up identification where the defendant wore the same clothing he wore during the robbery).

¶ 106   Moreover, in *People v. Bragg*, 277 Ill. App. 3d 468, 474 (1995), the reviewing court rejected the defendant's claim that a lineup was unduly suggestive because the clothing he wore in the lineup matched the witnesses' descriptions. The court also stated that "there is no requirement that police find matching clothes for everyone in the lineup." In *People v. Faber*, 2012 IL App (1st) 093273, this court held that a lineup was not unduly suggestive even though the defendant was "the only person wearing a sleeveless T-shirt" when the victim described the offender as wearing a "Dago-T." *Id.* ¶ 57 (citing *People v. Johnson*, 222 Ill. App. 3d 1, 8 (1991) (where the court held that a lineup was not suggestive despite that the defendant was the only

one wearing red trousers in an investigation where the offender was described as wearing red trousers)).

¶ 107   Even though defendant in this case was wearing the same clothing in the lineup that he apparently wore during the robbery and when he was arrested, defendant has been fairly identified, in part, as a result of his wardrobe *faux pas*. One could call that situation unlucky for the defendant or serendipitous for the prosecution, but it clearly is not a basis for retrial. I would affirm defendant's convictions on the merits and remand only for a *Krankel* hearing.

¶ 108   On the subject of the relief granted, I must say that I am puzzled that my colleagues are remanding for a hearing where the trial court is to determine whether an independent basis exists upon which the identifications of the victims should be admissible. The trial court has already conducted such a hearing and has made the determination that the lineups were not unduly suggestive and that the identifications of the two witnesses in question were sufficiently independent to be admissible. Defendant and the majority have manifestly failed in proving that the lineups were unduly suggestive and have also failed in establishing that the trial court findings in this regard were against the manifest weight of the evidence, which is the appropriate standard of review here.

¶ 109   Finally, even if one were to assume that the lineup procedures were unduly suggestive, the testimony at the suppression hearing and at trial sufficiently showed that the in-court identifications of defendant had an origin independent from the lineup identifications. See *People v. Brooks*, 187 Ill. 2d 91, 129 (1986) (finding that the testimony at the pretrial hearing and at trial provided a sufficient account of events to determine whether the identification had an independent basis, rendering it unnecessary to remand for further proceedings). The witnesses

here identified defendant shortly after the offense occurred. They had the opportunity to view their assailant, paid a great deal of attention to his appearance, provided an incredibly accurate description of the offender, and demonstrated the identification with absolute certainty. See *Brooks*, 187 Ill. 2d at 129-30. Any further proceedings would be futile.